# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* BEERS/LEBEAU-BEERS, Minors.

FOR PUBLICATION
September 11, 2018
9:00 a.m.

Nos. 341100; 341101
Eaton Circuit Court
Family Division
LC No. 15-019320-NA

Before: MURPHY, P.J., and GLEICHER and LETICA, JJ.

MURPHY, P.J.

The trial court terminated the parental rights of respondent-mother and respondent-father to the two minor children, TB and OL, under MCL 712A.19b(3)(c)(*i*) (conditions of adjudication continue to exist) and (g) (failure to provide proper care or custody).[1] The proceedings were driven by respondents' severe drug addictions, primarily involving the abuse of opiates. In these consolidated appeals, respondent-father appeals as of right the termination of his parental rights to TB in Docket No. 341100; he expressly declines to challenge the termination order as it pertains to OL. And in Docket No. 341101, respondent-mother appeals as of right the termination of her parental rights to both minor children. Respondent-mother is a member of the Cheyenne River Sioux Tribe of South Dakota (the tribe), and there is no dispute that TB and OL are Indian children for purposes of the federal Indian Child Welfare Act (ICWA), 25 USC 1901 *et seq*., the Michigan Indian Family Preservation Act (MIFPA), MCL 712B.1 *et seq*., and MCR 3.977(G). ICWA and MIFPA, along with MCR 3.977(G), set forth various procedural and substantive protections, mostly duplicative of each other, which are triggered when an Indian child is the subject of a child protective proceeding, going beyond the burdens generally applicable to such a proceeding. The trial court applied the appropriate heightened standards or burdens when terminating respondent-mother's parental rights, but it failed to apply them when terminating the parental rights of respondent-father, ostensibly because the Indian heritage of the children is solely through their mother's bloodline. Respondent-father argues that ICWA and MIFPA standards govern the termination of his parental rights, considering that TB is his biological child and an Indian child, regardless of respondent-father's personal heritage. We

---

[1] Respondents were not married and, with respect to OL, respondent-father did not execute an affidavit of parentage, so the case proceeded against him as OL's putative father. Respondent-father did sign an affidavit of parentage in regard to TB.

-1-

agree and conditionally reverse the termination of respondent-father's parental rights to TB and remand for proceedings consistent with ICWA and MIFPA, as well as MCR 3.977(G). Respondent-mother contends that the trial court erred in terminating her parental rights, because petitioner, the Department of Health and Human Services (DHHS), and the tribe failed to make the required "active efforts" at preventing the breakup of her family, and because the evidence did not establish beyond a reasonable doubt that her continued custody of TB and OL was likely to result in serious emotional or physical damage to the children. We disagree and affirm the trial court's ruling terminating respondent-mother's parental rights to the children.

## I. TERMINATION OF PARENTAL RIGHTS – MICHIGAN LAW

### A. GENERAL PRINCIPLES

Under Michigan law, if a trial court finds that a single statutory ground for termination of parental rights has been established by clear and convincing evidence and that it has also been proved by a preponderance of the evidence that termination of parental rights is in the best interests of a child, the court is required to terminate a respondent's parental rights to that child. MCL 712A.19b(3) and (5); *In re Beck*, 488 Mich 6, 10-11; 793 NW2d 562 (2010); *In re Moss,* 301 Mich App 76, 90; 836 NW2d 182 (2013); *In re Ellis*, 294 Mich App 30, 32; 817 NW2d 111 (2011). The two statutory grounds implicated in this case were MCL 712A.19b(3)(c)(*i*) and (g), which provide for termination under the following circumstances:

> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:
>
> (*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.
>
> * * *
>
> (g) The parent, without regard to intent, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.[2]

---

[2] Pursuant to 2018 PA 58, and made effective June 12, 2018, subsection (3)(g) now provides as follows:

> The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

-2-

## B. MIFPA AND THE MICHIGAN RULES OF COURT

Pursuant to 2012 PA 565, the Legislature enacted MIFPA, which was made effective January 2, 2013. "[T]he Legislature adopted MIFPA to establish state law standards for child welfare and adoption proceedings involving Indian children." *In re Williams*, __ Mich __, __; __ NW2d __ (2018); slip op at 6. MIFPA was designed to protect the best interests of Indian children, to promote the security and stability of Indian tribes and families, and to ensure the employment of practices by the DHHS that are in accord with ICWA, MIFPA itself, and other applicable law whose goal is to prevent removal of Indian children or, if removal is necessary, to place the Indian child in an environment that reflects the unique values of the child's tribal culture. MCL 712B.5(a) and (b); *Williams*, __ Mich at __; slip op at 6. In child custody proceedings, and in consultation with an Indian child's tribe, these policy directives or goals must be considered when determining the best interests of the Indian child. MCL 712B.5. As part of MIFPA, MCL 712B.15 provides, in pertinent part:

> (3) A party seeking a termination of *parental* rights to an Indian child under state law must demonstrate to the court's satisfaction that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that the active efforts were unsuccessful.
>
> (4) No termination of *parental* rights may be ordered in a proceeding described in this section without a determination, supported by evidence beyond a reasonable doubt, including testimony of at least 1 qualified expert witness as described in section 17, that the continued custody of the Indian child by the *parent* or Indian custodian is likely to result in serious emotional or physical damage to the Indian child. [Emphasis added.[3]]

---

[3] In *Williams*, __ Mich at __; slip op at 7-9, our Supreme Court, citing MCL 712B.15(1) to (4), provided a summarization of the heightened evidentiary and procedural burdens required of the state under MIFPA, observing:

> For example: (1) the state must give notice of the pending proceeding to the Indian tribe; (2) before removal or to continue removal, the state must prove by clear and convincing evidence that active efforts were made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family, that the active efforts were unsuccessful, and that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child; (3) when seeking termination, the state must demonstrate that active efforts were made to prevent the breakup of the Indian family and that the efforts were unsuccessful; and (4) any termination of parental rights must be supported by evidence beyond a reasonable doubt and by the testimony of at least one qualified expert who knows about the child-rearing practices of the Indian child's tribe.

Respondent-father is alleging a violation of these two subsections. And MIFPA defines "parent" as "*any biological parent . . . of an Indian child* or any person who has lawfully adopted an Indian child . . . ." MCL 712B.3(s) (emphasis added). But a "[p]arent does not include the putative father if paternity has not been acknowledged or established." *Id.*[4] With respect to TB, an Indian child, there is no dispute that respondent-father is a biological parent, having signed the affidavit of parentage regarding TB. See MCL 722.1003(1) ("If a child is born out of wedlock, a man is considered to be the natural father of that child if the man joins with the mother of the child and acknowledges that child as his child by completing a form that is an acknowledgment of parentage."). As reflected in the definition of "parent," even adoptive parents of an Indian child, regardless of their heritage, enjoy the benefit of the heightened burdens that seek to protect Indian children from familial disruptions.

The fact that a "parent," as defined in MCL 712B.3(s), is afforded protection under MIFPA is further spelled out in MCL 712B.39, which provides:

> Any Indian child who is the subject of an action for foster care placement or termination of parental rights under state law, *any parent* or Indian custodian from whose custody an Indian child was removed, and the Indian child's tribe may petition any court of competent jurisdiction to invalidate the action upon a showing that the action violated any provision of sections 7, 9, 11, 13, 15, 21, 23, 25, 27, and 29 of this chapter. [Emphasis added.]

As indicated earlier, respondent-father is alleging a violation of subsections (3) and (4) of § 15 of MIFPA.

Aside from MIFPA, MCR 3.977, which is the court rule addressing the termination of parental rights, provides in subrule (G) as follows:

> In addition to the required findings in this rule, *the parental rights of a parent of an Indian child must not be terminated unless*:

> (1) the court is satisfied that active efforts as defined in MCR 3.002 have been made to provide remedial service and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful, and

---

[4] "We review de novo issues involving the interpretation and application of MIFPA." *In re Detmer*, 321 Mich App 49, 59; 910 NW2d 318 (2017). When construing a statute, our goal is to discern the intent of the Legislature, looking first to the language of the statute, and if the statutory language is clear and unambiguous, we must enforce it as written. *Id.* at 59-60.

(2) the court finds evidence beyond a reasonable doubt, including testimony of at least one qualified expert witness as described in MCL 712B.17, that parental rights should be terminated because continued custody of the child by the parent or Indian custodian will likely result in serious emotional or physical damage to the child. [Emphasis added.]

MCR 3.002 includes, in part, the definitions taken from MCL 712B.3, thereby reiterating that a "parent" is "any biological parent . . . of an Indian child." MCR 3.002(20).

With respect to the "active efforts" provisions in MIFPA and MCR 3.977(G)(1), such efforts must be proven by clear and convincing evidence. *In re England*, 314 Mich App 245, 258-259; 887 NW2d 10 (2016). "Active efforts" are defined as "actions to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and to reunify the Indian child with the Indian family." MCL 712B.3(a); see also MCR 3.002(1). MIFPA and the court rule provide an extensive list of actions and efforts that must be undertaken by the state in order to satisfy the "active efforts" requirement. MCL 712B.3(a)(*i*) to (*xii*); MCR 3.002(1)(a) to (*l*). We also note that MIFPA requirements are in addition to the mandate that petitioner prove a statutory ground for termination by clear and convincing evidence. *England*, 314 Mich App at 253; see also MCR 3.977(G) ("*In addition to* the required findings in this rule, the parental rights of a parent of an Indian child must not be terminated unless . . . .") (emphasis added).

## II. TERMINATION OF PARENTAL RIGHTS – FEDERAL LAW – ICWA

"In 1978, Congress enacted ICWA in response to growing concerns over 'abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes.' " *In re Morris*, 491 Mich 81, 97-98; 815 NW2d 62 (2012), quoting *Mississippi Band of Choctaw Indians v Holyfield*, 490 US 30, 32; 109 S Ct 1597; 104 L Ed 2d 29 (1989). The United States Congress, in 25 USC 1902, stated:

The Congress hereby declares that it is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs.

Section 1912(d) of ICWA provides that "[a]ny party seeking . . . termination of parental rights to[] an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." As with "active efforts" under MIFPA, "active efforts" for purposes of ICWA must also be proven by clear and convincing evidence. *England*, 314 Mich App at 258-259. Next, 25 USC 1912(f) provides that "[n]o termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." Comparable to the definition of "parent" found in MCR 3.002(20) and § 3(s) of MIFPA, 25 USC 1903(9)

defines "parent" as "any biological parent or parents of an Indian child or any Indian person who has lawfully adopted an Indian child, including adoptions under tribal law or custom."

ICWA also has a similar provision to § 39 of MIFPA, providing in 25 USC 1914 as follows:

> Any Indian child who is the subject of any action for foster care placement or termination of parental rights under State law, *any parent* or Indian custodian from whose custody such child was removed, and the Indian child's tribe may petition any court of competent jurisdiction to invalidate such action upon a showing that such action violated any provision of sections 1911, 1912, and 1913 of this title. [Emphasis added.]

Finally, "in addition to finding that at least one state statutory ground for termination was proven by clear and convincing evidence, the trial court must also make findings in compliance with ICWA before terminating parental rights." *In re Payne/Pumphrey/Fortson*, 311 Mich App 49, 58; 874 NW2d 205 (2015).

## III. TERMINATION OF RESPONDENT-FATHER'S PARENTAL RIGHTS

At the close of the termination hearing, which respondent-father did not attend,[5] the trial court began its ruling from the bench by indicating that because the children are Indian children, it was required to apply a beyond-a-reasonable-doubt standard "to terminate the parental rights as to the mother." The court then noted that respondent-father "does not have any Native American heritage." With respect to respondent-father, the trial court found that he had done nothing to perfect paternity in regard to OL, but the court did recognize him as TB's "legal father." The trial court further found, as to respondent-father, that his housing situation was totally unknown, that his last visitation with TB was approximately 10 months earlier, that he had done nothing to address his emotional instability, that he would disappear for long periods of time, that he had not participated in services, and that he had not progressed in regard to his substance abuse issues. Accordingly, the trial court determined that petitioner had established MCL 712A.19b(3)(c)(*i*) and (g) by clear and convincing evidence. The trial court then reviewed various best-interest factors and concluded that termination of respondent-father's parental rights was in the children's best interests. The court did not apply any of the protections, burdens, or standards set forth in ICWA, MIFPA, and MCR 3.977(G).

An order terminating the parental rights of both respondents relative to the two children was entered by the trial court. The order, on a standard court form, had boxes checked indicating that the children were Indian children, that there existed clear and convincing evidence of a statutory basis for termination, and that termination of parental rights was in the best interests of the children. Another checked box on the order provided:

---

[5] Respondent-father was, however, represented by counsel at the termination hearing and throughout the lower court proceedings. His attorney did inform the court at the termination hearing that counsel last had "face-to-face contact" with respondent-father approximately a year before the hearing.

Active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family. These efforts have proved unsuccessful and there is evidence beyond a reasonable doubt, including expert witness testimony, that continued custody of the child(ren) by the parent(s) or Indian custodian will likely result in serious emotional or physical damage to the child(ren).

The trial court made no such ruling from the bench in relation to respondent-father, and it is clear that this provision in the order applied solely to respondent-mother, especially considering that the court had also checked the box regarding the generally-applicable "reasonable efforts" language, presumably in reference to respondent-father.

On appeal, respondent-father argues that the trial court erred in failing to apply MIFPA and ICWA standards when assessing whether to terminate his parental rights to TB. More specifically, respondent-father claims a violation of the "active efforts" and "beyond a reasonable doubt" provisions of MIFPA, respectively MCL 712B.15(3) and (4), and those same provisions in ICWA, respectively 25 USC 1912(d) and (f).[6] Petitioner concedes that the trial court was required to apply MIFPA and ICWA burdens and protections with respect to respondent-father and failed to do so. Petitioner, however, urges us to affirm the termination of respondent-father's parental rights under plain-error review. Petitioner contends that respondent-father's argument is "nothing more than an appellate after-thought" and "[a] means to raise a technical violation in an attempt to obtain a result that [respondent-father] has done nothing to earn." Petitioner further maintains that even if the trial court had considered respondent-father's efforts, which were essentially nonexistent, under the enhanced ICWA and MIFPA burdens, his "parental rights still would have been properly terminated." While we are somewhat sympathetic to petitioner's sentiments, considering the record of respondent-father's noninvolvement, we cannot oblige petitioner.

Because TB is an Indian child and respondent-father is TB's biological parent, we hold that respondent-father's parental rights should not have been terminated absent compliance with MIFPA, ICWA, and MCR 3.977(G), even though respondent-father himself has no Indian lineage. 25 USC 1903(9); 25 USC 1912(d) and (f); MCL 712B.3(s); MCL 712B.15(3) and (4); MCR 3.002(20); MCR 3.977(G).[7] Accordingly, the trial court erred in terminating respondent-father's parental rights to TB. However, before addressing petitioner's plain-error argument and

---

[6] Respondent-father does not argue that the trial court erred in finding that clear and convincing evidence was presented establishing the statutory grounds for termination under MCL 712A.19b(3)(c)(*i*) and (g). We also note that respondent-father does not raise an issue concerning the adjudicative phase of the proceedings, where in December 2015 he entered a plea of admission to the allegations in DHHS's petition.

[7] We are not aware of any published opinion that has expressly held that the termination of parental rights of a non-Indian, biological parent of an Indian child is subject to the demands of ICWA, MIFPA, and MCR 3.977(G). However, the principle can be implied from the caselaw. See, e.g., *In re Jones*, 316 Mich App 110; 894 NW2d 54 (2016) (conditionally reversing termination as to the mother, even though Indian lineage was potentially through the father alone).

the proper remedy for the error, it is incumbent on us to address an issue not raised by the parties.

When respondents signed the affidavit of parentage, respondent-mother, by operation of MCL 722.1006, received legal and physical custody of TB. *Sims v Verbrugge*, 322 Mich App 205, 214; 911 NW2d 233 (2017). MCL 722.1006 provides:

> After a mother and father sign an acknowledgment of parentage, the mother has initial custody of the minor child, without prejudice to the determination of either parent's custodial rights, until otherwise determined by the court or otherwise agreed upon by the parties in writing and acknowledged by the court. This grant of initial custody to the mother shall not, by itself, affect the rights of either parent in a proceeding to seek a court order for custody or parenting time.

TB was born on August 14, 2015, respondents executed the affidavit of parentage on August 15th, TB remained in the hospital until August 24th, and on August 24th, DHHS filed its petition requesting the court to take jurisdiction of TB, although it was recommended "that the child remain in the home with [his] parents," which recommendation was followed by the court. With petitioner providing a variety of services, respondent-mother, respondent-father, and TB lived together as a family unit. The trial court authorized TB's removal from the home on November 13, 2015. Subsequent hearings in November and December 2015, as well as January 2016, revealed that respondents still resided together and were a couple. Because there were no court proceedings regarding custody, as between respondent-father and respondent-mother, following TB's birth and the signing of the affidavit of parentage, respondent-mother was treated under the law as having sole physical and legal custody of TB, with respondent-father having no custodial rights, despite physically residing with the child for a period of time.

As indicated earlier, 25 USC 1912(f) provides that "[n]o termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the *continued custody* of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." (Emphasis added.) MIFPA, specifically MCL 712B.15(4), and MCR 3.977(G)(2), have the same "continued custody" language. The question that we raise sua sponte is whether the heightened standards of ICWA, MIFPA, and MCR 3.977(G) should apply to the termination of respondent-father's parental rights when he never had legal or physical custody rights in regard to TB.

In *Adoptive Couple v Baby Girl*, 570 US 637; 133 S Ct 2552; 186 L Ed 2d 729 (2013), the United States Supreme Court addressed a situation in which a child was conceived by an unwed couple, the father was of Indian heritage, the couple separated prior to the birth, the mother decided, before the birth, to place the child up for adoption, a prospective adoptive couple emotionally and financially supported the mother during her pregnancy, with no support being provided by the father, and the child was then born. Four months after the birth, the prospective adoptive couple served the father with notice of the pending adoption, and the father executed papers indicating that he would not be contesting the adoption, although he later claimed that he believed that he was relinquishing his rights in favor of the mother, not the prospective adoptive couple. In the adoption proceedings, the father, whose paternity had now

been confirmed by biological testing, challenged the adoption and sought custody of the child. The family court, in South Carolina, determined that the prospective adoptive couple did not carry the heightened burden under 25 USC 1912(f) of establishing beyond a reasonable doubt that the child would suffer serious harm if the father was given custody. The adoption petition was denied, the father was awarded custody, and, at the age of 27 months, the child was handed over to the father, whom the child had never met. *Id.* at 643-645. The case made its way to the United States Supreme Court, which held that neither 25 USC 1912(f) or 1912(d) (active efforts) barred the termination of the father's parental rights. *Id.* at 646-647.

The Court ruled that the phrase "continued custody" necessarily envisions a situation in which a parent, who is subject to protective proceedings, has custody of an Indian child or had custody of the Indian child at some point in the past. *Id.* at 648. According to the Court, § 1912(f) is not applicable when a parent never had custody of an Indian child, because there is no custody to continue. *Id.* The Court held that "when, as here, the adoption of an Indian child is voluntarily and lawfully initiated by a non-Indian parent *with sole custodial rights*, the ICWA's primary goal of preventing the unwarranted removal of Indian children and the dissolution of Indian families is not implicated." *Id.* at 649 (emphasis added). Moving on to the "active efforts" provision, § 1912(d), the Court held:

> Consistent with the statutory text, we hold that § 1912(d) applies only in cases where an Indian family's "breakup" would be precipitated by the termination of the parent's rights. The term "breakup" refers in this context to the discontinuance of a relationship, or an ending as an effective entity . . . . But when an Indian parent abandons an Indian child prior to birth and that child has never been in the Indian parent's legal or physical custody, there is no "relationship" that would be discontinued—and no effective entity that would be ended—by the termination of the Indian parent's rights. In such a situation, the "breakup of the Indian family" has long since occurred, and § 1912(d) is inapplicable. [*Adoptive Couple*, 570 US at 651-652 (citations, quotation marks, and alteration brackets omitted).]

The Court observed that the various provisions in § 1912 "strongly suggest[] that the phrase 'breakup of the Indian family' should be read in harmony with the 'continued custody' requirement." *Id.* at 652.

Justice ALITO wrote the majority opinion, and he was joined by two other Justices who did not write separately; there were four dissenting Justices. Justice THOMAS concurred in "the Court's opinion in full" but wrote "separately to explain why constitutional avoidance compels [the] outcome." *Id.* at 656. He opined that "the Constitution does not grant Congress power to override state law whenever that law happens to be applied to Indians"; therefore, "application of the ICWA to these child custody proceedings would be unconstitutional." *Id.* at 666. But Justice THOMAS concluded that "[b]ecause the Court's plausible interpretation of the relevant sections of the ICWA avoids these constitutional problems," he concurred. The other concurrence, by Justice BREYER, which supplied the fifth vote in favor of the opinion crafted by Justice ALITO, provided, in full, as follows:

I join the Court's opinion with three observations. First, the statute does not directly explain how to treat an absentee Indian father who had next-to-no involvement with his child in the first few months of her life. That category of fathers may include some who would prove highly unsuitable parents, some who would be suitable, and a range of others in between. Most of those who fall within that category seem to fall outside the scope of the language of 25 USC §§ 1912(d) and (f). Thus, while I agree that the better reading of the statute is, as the majority concludes, to exclude most of those fathers, I also understand the risk that, from a policy perspective, the Court's interpretation could prove to exclude too many.

Second, we should decide here no more than is necessary. Thus, this case does not involve a father with visitation rights or a father who has paid all of his child support obligations. Neither does it involve special circumstances such as a father who was deceived about the existence of the child or a father who was prevented from supporting his child. The Court need not, and in my view does not, now decide whether or how §§ 1912(d) and (f) apply where those circumstances are present.

Third, other statutory provisions not now before us may nonetheless prove relevant in cases of this kind. Section 1915(a) grants an adoptive "preference" to "(1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families . . . in the absence of good cause to the contrary." Further, § 1915(c) allows the "Indian child's tribe" to "establish a different order of preference by resolution." Could these provisions allow an absentee father to reenter the special statutory order of preference with support from the tribe, and subject to a court's consideration of "good cause?" I raise, but do not here try to answer, the question. [*Adoptive Couple*, 570 US at 666-667 (citations and quotation marks omitted; ellipsis in original).]

This concurrence essentially indicated that, for purposes of the case before the Court, the "continuing custody" analysis by Justice ALITO was fine, but there may be other cases in which it is not.

Given the equivocal nature of Justice BREYER's concurrence, it cannot truly be said that a majority of the United States Supreme Court created an inflexible rule for purposes of "continuing custody" analysis under § 1912(f), as well as the analysis of § 1912(d). And even assuming the contrary, it certainly is not clear whether the Supreme Court would impose the rule based solely on whether a parent had physical custody, in the strictest sense of the term under the law, where a custodial-like environment existed on a practical level absent any technical custodial rights.[8] The father in *Adoptive Couple* did not have legal or physical custody of the

---

[8] For example, if a father and mother of an Indian child were unwed but lived together for years as a family, despite the mother having sole legal and physical custody of the child by operation of law or court order, we cannot imagine the Supreme Court holding that the father, especially if he had Indian heritage, could have his parental rights terminated without application of heightened burdens, merely because he did not have legal or physical custody rights under the law.

child, as the mother had sole legal and physical custody, *and* the father had never spent any time with, cared for, or resided with the child. The Court found that the father "never had *physical* custody of" the child. *Adoptive Couple*, 570 US at 650. Nor did the father have "*legal* custody," where South Carolina law provided, " 'Unless the court orders otherwise, the custody of an illegitimate child is solely in the natural mother[.]' " *Id.*, quoting SC Code Ann § 63-17-20(B). The Court's reference to "physical" custody did not suggest that the Court only equated physical custody to custody that arises by operation of law or court order, as opposed to a scenario in which a parent simply provides a custodial environment for a child.

We hold that under the particular facts of the instant case, which are entirely dissimilar to those in *Adoptive Couple* where the father effectively abandoned the child from birth and even in utero, the beyond-a-reasonable-doubt standard applies to the termination of respondent-father's parental rights, although he never had legal or physical custody rights, as those terms are legally employed. When DHHS's petition was filed in August 2015 and for a period thereafter, respondent-father, respondent-mother, and TB lived together as a familial unit wherein respondent-father was providing some care and custody for TB. And petitioner was providing reunification services. The family unit dissolved only when TB was removed by court order, although respondents remained together. The removal of TB discontinued the custodial arrangement that had existed with respect to both respondents and TB, if not in law, in practice.

We also note that, as alluded to earlier, MCL 722.1006 provides that "after a mother and father sign an acknowledgment of parentage, the mother has initial custody of the minor child, *without prejudice to the determination of either parent's custodial rights*[.]" (Emphasis added.) Allowing the operation of MCL 722.1006 to negate the protections of ICWA, MIFPA, and MCR 3.977(G) in the context of cases in which a father of an Indian child is providing or has provided care and custody for the Indian child, absent legally-recognized custodial rights, could certainly be viewed as being prejudicial to the father's custodial rights.

In assessing the impact of *Adoptive Couple*, our reasoning in rejecting application of the Supreme Court's "continuing custody" analysis to the particular facts of this case applies equally to the state and federal "active efforts" provisions, given that there was an existing intact Indian family and an existing relationship between respondent-father and TB when petitioner intervened for the protection of TB, began providing services, and then removed TB by court order. The breakup of the Indian family had not yet occurred when the petition was filed and TB was removed. But we must go one step further and examine this Court's opinion in *In re SD*, 236 Mich App 240; 599 NW2d 772 (1999). There, this Court addressed a situation where the non-Indian father and the Indian mother of their Indian children had separated and the children were residing with their mother; the father was not involved in the children's lives and had sexually abused one child. The mother was not the subject of any DHHS petition. This Court, while accepting that the state had to prove beyond a reasonable doubt that custody of the children by the father would likely result in damage to the children, determined that "active efforts" to provide services to him to prevent the breakup of the "Indian family" under ICWA was unnecessary. *Id.* at 244-246.

The panel reasoned that "the family had already broken up by the time the termination proceedings were initiated" and that an "Indian family" was not being broken up, where the children's mother was the parent with the Indian heritage and she remained with the children. *Id.*

at 244-245. Like *Adoptive Couple*, we conclude that *In re SD* is factually distinguishable. Here, a petition for jurisdiction had been authorized and DHHS commenced providing reunification services while respondents and TB were living together as an Indian family, which ended only upon TB's removal from the home at petitioner's behest. Both respondents were subject to parallel protective proceedings, with their parental rights being terminated at the same time, and respondent-mother did not remain with TB as an intact Indian family. Thus, *In re SD* is inapplicable.

We now address petitioner's plain-error argument and the issue of the proper remedy. Generally speaking, in termination proceedings, we review unpreserved claims under the plain-error test. *In re VanDalen*, 293 Mich App 120, 135; 809 NW2d 412 (2011); *In re Utrera*, 281 Mich App 1, 8-9; 761 NW2d 253 (2008). To avoid forfeiture under the plain-error test, an error that was clear and obvious must be established, along with a showing that the error affected substantial rights. *VanDalen*, 293 Mich App at 135. "[A]n error affects substantial rights if it caused prejudice, i.e., it affected the outcome of the proceedings." *Utrera*, 281 Mich App at 9. The fatal flaw in petitioner's plain-error argument is that respondent-father was not required to object to or otherwise challenge the trial court's ruling from the bench in order to preserve the issues on appeal. See MCR 2.517 (addressing findings in a bench trial and stating that "[n]o exception need be taken to a finding or decision"). Moreover, were we to apply plain-error analysis, it would effectively be necessary for us to conclude that "active efforts" at reunification were demonstrated relative to respondent-father and that there was evidence beyond a reasonable doubt that the custody of TB by respondent-father would likely result in serious emotional or physical damage to TB. 25 USC 1912(d) and (f); MCL 712B.15(3) and (4); MCR 3.977(G). These criteria were not examined and the standards were not employed by the trial court, and we would be in danger of engaging in improper appellate fact-finding if we attempted to decide the matters based on the existing record. See *People v Thompson*, 314 Mich App 703, 712 n 5; 887 NW2d 650 (2016).

Respondent-father prays for relief that reverses the trial court's termination order and remands the case for entry of an order releasing TB to respondent-father, or that least awards him parenting time and additional services. We hold that the proper remedy in this case is to conditionally reverse the order terminating respondent-father's parental rights to TB and remand for the trial court to address and resolve the issues regarding "active efforts" and the potential of serious emotional or physical damage to TB if custody continued with respondent-father, as analyzed under a beyond-a-reasonable-doubt standard. See *In re McCarrick/Lamoreaux*, 307 Mich App 436, 469; 861 NW2d 303 (2014) ("We conditionally reverse and remand for the trial court to determine whether McCarrick's continued custody would result in serious emotional or physical damage to the children."). Stated otherwise, we reverse and remand to the trial court for compliance with 25 USC 1912(d) and (f), MCL 712B.15(3) and (4), and MCR 3.977(G). Given the record regarding respondent-father, there clearly could be a risk of harm or danger to TB were we to order the trial court to release TB to respondent-father. See *McCarrick/Lamoreaux*, 307 Mich App at 469 ("we decline to automatically reverse the trial court's order in this case because doing so could place the child in danger"). The trial court is of course free to enter any interim orders pending its compliance with this opinion.

IV. TERMINATION OF RESPONDENT-MOTHER'S PARENTAL RIGHTS

Respondent-mother argues that petitioner failed to present clear and convincing evidence that "active efforts" had been made to provide services designed to prevent the breakup of her Indian family. She contends that petitioner did not utilize resources available through the tribe, or otherwise engage the tribe in the case, until 15 months after the original petition was filed. Respondent-mother complains that the tribe took a passive role in the proceedings. She further maintains that petitioner failed to provide "active efforts" under the definitional requirements set forth in MCL 712B.3(a)(*i*), (*iv*), (*vi*), and (*ix*).[9] Respondent-mother argues that there was no evidence that petitioner did anything more than provide "reasonable efforts" at reunification, thereby failing to satisfy the heightened "active efforts" burden.

For purposes of ICWA and MIFPA, "active efforts" must be proven by clear and convincing evidence. *England*, 314 Mich App at 258-259. The factual findings by the trial court are reviewed for clear error, with any issue regarding the interpretation and application of the

---

[9] Under MCL 712B.3(a), "active efforts" include the following relevant efforts:

> (*i*) Engaging the Indian child, child's parents, tribe, extended family members, and individual Indian caregivers through the utilization of culturally appropriate services and in collaboration with the parent or child's Indian tribes and Indian social services agencies.

> * * *

> (*iv*) Requesting representatives designated by the Indian child's tribe with substantial knowledge of the prevailing social and cultural standards and child rearing practice within the tribal community to evaluate the circumstances of the Indian child's family and to assist in developing a case plan that uses the resources of the Indian tribe and Indian community, including traditional and customary support, actions, and services, to address those circumstances.

> * * *

> (*vi*) Identifying, notifying, and inviting representatives of the Indian child's tribe to participate in all aspects of the Indian child custody proceeding at the earliest possible point in the proceeding and actively soliciting the tribe's advice throughout the proceeding.

> * * *

> (*ix*) Offering and employing all available family preservation strategies and requesting the involvement of the Indian child's tribe to identify those strategies and to ensure that those strategies are culturally appropriate to the Indian child's tribe.

relevant federal and state statutory provisions being reviewed de novo. *In re Johnson*, 305 Mich App 328, 331; 852 NW2d 224 (2014). As observed earlier, "active efforts" are defined as "actions to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and to reunify the Indian child with the Indian family." MCL 712B.3(a); see also MCR 3.002(1). "Active efforts" require affirmative, as opposed to passive, efforts, and "active efforts" require more than the standard reasonable-efforts approach. *In re JL*, 483 Mich 300, 321; 770 NW2d 853 (2009). "Active efforts require more than a referral to a service without actively engaging the Indian child and family." MCL 712B.3(a); MCR 3.002(1). "Active efforts" entail a caseworker taking a client through the steps of a treatment plan rather than requiring the client to perform the plan on his or her own. *In re JL*, 483 Mich at 321.

Respondent-mother acknowledges that petitioner mailed notices of all hearings to the tribe, but she argues that there is no evidence that petitioner made meaningful efforts to involve the tribe. There is no dispute that petitioner provided proper notice to the tribe and that the tribe did not initially respond to the notice to confirm or deny tribal membership. Nonetheless, notices of every hearing and copies of the petitions and reports were fully provided to the tribe. A Michigan caseworker assigned to respondent-mother's case testified that she made phone contact with tribal caseworkers, but they initially seemed disinterested. However, once the tribe expressed its intent to intervene, petitioner withdrew the termination petition and the tribe participated in all subsequent hearings via telephone.

Evidence was presented that petitioner offered or provided respondent-mother with assessments, treatment, counseling, drug screens, and services related to her substance abuse issues.[10] Psychological evaluations, counseling, therapy, parenting time, in-home services, and various family programs were also offered or provided. Family team meetings were held to address respondent-mother's barriers to reunification and to assist her in complying with court orders. The qualified expert witness from the tribe who was assigned to the case testified that she had received reports and updates from petitioner, that she had been included in treatment plans, that she had been able to provide input for services, and that she had participated in family team meetings. The tribal expert additionally testified that while the tribe itself did not have many services available, services were offered to respondent-mother, but she failed to contact the tribe to take advantage of the services. The record reveals that respondent-mother was resistant to petitioner's efforts and did not cooperate or benefit from the services that were provided to her. She refused to acknowledge that she indeed had a drug problem. The tribal expert testified that she could not think of any relevant service that had not been offered to respondent-mother, and in the expert's opinion, "active efforts" had been made to reunite respondent-mother with her children.

In light of this evidence, respondent-mother's argument that petitioner failed to make the requisite "active efforts" is unavailing. The trial court did not clearly err in finding that there was clear and convincing evidence that "active efforts" were made to prevent the breakup of the Indian family and that the efforts were unsuccessful.

---

[10] TB had tested positive for various opiates and benzodiazepines at birth.

Respondent-mother next argues that the trial court erred in terminating her parental rights where the evidence did not support beyond a reasonable doubt that her custody of the children would likely result in serious emotional or physical damage to the children. Respondent-mother contends that, based on her previous argument that petitioner failed to make "active efforts" to prevent the breakup of the family, the evidence presented by petitioner did not amount to proof beyond a reasonable doubt. Her appellate brief again discusses the purported lack of services provided to her. As already held, the "active efforts" argument lacks merit.

Respondent-mother also maintains that, because her current counselor testified at the termination hearing that respondent-mother was actively engaged in therapy and was working through her communication issues,[11] and because respondent-mother had been off of heroin for about a year, the evidence was insufficient to meet the high evidentiary burden.

The trial court found that the evidence, which included the testimony of the tribal expert, established beyond a reasonable doubt that continued custody of the children with respondent-mother would likely result in serious emotional or physical damage to the children. The trial court explained:

> [F]rom the things that I've summarized in this case, based on emotional stability and substance abuse factors, that the efforts that have been provided and offered have not made any appreciable change other than some changes regarding employment, which has been great, and housing, which has been great, but as far as underlying issues, which are substance abuse and emotional stability, those just have not changed to any great degree.

The factors considered by the trial court included respondent-mother's failure to cooperate with and benefit from services designed to address her substance abuse, her failure to acknowledge that she had a substance abuse problem, her resistance to therapy and the need for another 18 to 24 months of intensive therapy to address her emotional instability, her failure to take personal responsibility for her children being in care, and her missed parenting times. The trial court also considered the tribal expert's testimony that the tribe's board of directors believed that it was in the best interests of the children to terminate respondent-mother's parental rights. In light of the tribal expert's testimony and the other evidence presented at the hearing, we cannot conclude the trial court clearly erred in finding beyond a reasonable doubt that custody of the children by respondent-mother would likely result in serious emotional or physical damage to the children. 25 USC 1912(f); MCL 712B.15(4); MCR 3.977(G)(2).

## V. CONCLUSION

In this appeal, respondent-father argues that ICWA and MIFPA standards govern the termination of his parental rights, considering that TB is his biological child and an Indian child, regardless of respondent-father's personal heritage. We agree and conditionally reverse the termination of respondent-father's parental rights to TB and remand for proceedings consistent

---

[11] The counselor had met with respondent-mother for seven sessions.

with ICWA and MIFPA, as well as MCR 3.977(G). In this appeal, respondent-mother contends that the trial court erred in terminating her parental rights, because petitioner and the tribe failed to make the required "active efforts" at preventing the breakup of her family, and because the evidence did not establish beyond a reasonable doubt that her continued custody of TB and OL was likely to result in serious emotional or physical damage to the children. We disagree and affirm the trial court's ruling terminating respondent-mother's parental rights to the children.

Affirmed in part, reversed and remanded in part for proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ William B. Murphy
/s/ Elizabeth L. Gleicher
/s/ Anica Letica