*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

In re HALL/ANDERSON, Minors.

UNPUBLISHED
September 1, 2022

Nos. 359871; 359872
Kent Circuit Court
Family Division
LC Nos. 20-051043-NA
    20-051044-NA
    20-051045-NA

Before: RIORDAN, P.J., and BORRELLO and LETICA, JJ.

PER CURIAM.

In these consolidated appeals,[1] respondent-mother and respondent-father appeal by right the trial court's order terminating their parental rights to the minor children, CH, MH, and AA. The trial court terminated both parents' parental rights to the children under MCL 712A.19b(3)(c)(*i*) (providing for termination when more than 182 days have passed since the original disposition and the conditions remain the same and there is no reasonable likelihood that the conditions will be rectified within a reasonable time), and additionally terminated respondent-mother's parental rights under MCL 712A.19b(3)(j) (stating that the trial court may terminate when there is a reasonable likelihood that the child will be harmed if returned to the parent's home). In Docket No. 359871, respondent-mother argues that the Department of Health and Human Services should have provided her with additional services and that the failure to do so precluded termination of her parental rights. She also maintains that termination of her parental rights was not in the children's best interests. Respondent-father argues in Docket No. 359872 that he did not knowingly and voluntarily relinquish his parental rights to the children at the termination hearing. Accordingly, he states, this Court should reverse the order terminating his parental rights and remand for further proceedings. For the reasons set forth in this opinion, we affirm in both cases.

---

[1] *In re Hall/Anderson Minors*, unpublished order of the Court of Appeals, entered January 18, 2022 (Docket Nos. 359871 and 359872).

-1-

## I. BACKGROUND

The Department of Health and Human Services petitioned to remove the children from their parents' care in June 2020. The Department alleged that Children's Protective Services (CPS) had been investigating respondent parents for problems involving domestic violence, substance abuse, and mental health problems since October 2017. CPS opened the most recent case in November 2019, after the children called and reported ongoing "yelling, property damage, and hitting" by both parents. The Department had been providing services to the parents since then.

The Department alleged that both parents had criminal histories, and the nature of the charges are consistent with domestic violence and substance abuse problems. Additionally, police officers had been called to intervene with the parents on 11 occasions since November 2019. The Department noted that respondent-mother had sought personal protection orders against respondent-father on four different occasions and that one of the minor children was currently on probation after having been adjudicated in a delinquency proceeding involving criminal sexual conduct. Respondent-mother had been diagnosed with persistent depressive disorder, generalized anxiety disorder, opioid use disorder, and alcohol use disorder while respondent-father tested positive for cocaine in February 2020. Respondent-mother also and had problems with crack cocaine and opioids in the past. The Department alleged that it created a safety plan in May 2020 to prevent the children from witnessing violence. As part of the plan, respondents agreed that they would no longer have any in-person contact. The Department alleged that the parents had not abided by the safety plan, and, as a result, the children continued to witness interpersonal violence. For these reasons, the Department asked the trial court to remove the children from their parents' care and take jurisdiction over each parents' parental rights to the children.

A referee authorized the petition after a hearing and the case proceeded to adjudication in August 2020. Respondent-mother pleaded to the allegations in the petition at the adjudication. The referee then took testimony from the CPS worker assigned to the case. The case worker testified about her knowledge of the allegations, which included testimony that respondent-father admitted many of the allegations to her with some qualifying statements. For example, respondent-father agreed that he tested positive for cocaine when she confronted him, but he stated that he did not know how the cocaine got into his system. He suggested that it must have happened somehow when he was hanging out with friends.

The case worker testified that she established a safety plan for the family in May 2020 and placed the children with their paternal grandmother. The case worker reported that respondent-father, however, did not comply with the safety plan. He would show up during respondent-mother's time for visits with the children, which caused "emotional turmoil and fighting and arguing."

After hearing the testimony, the referee found that the Department proved grounds for asserting jurisdiction over respondent-father's rights to the children. The referee went through each paragraph of the allegations in the petition and made specific findings. The referee made handwritten notes on the allegation in the petition to reflect the findings and put a "check" next to the allegations that the referee had found to have been proved.

The referee then moved into a dispositional phase. A social worker from D.A. Blodgett-St. Johns testified that she was the foster-care who had been assigned to the children's case. One of the minor children had been participating in the Adolescent Sex Offender Treatment Program through juvenile probation. One of the other minor children was doing well, but she struggled to let go of her protective habits as the minor child had been caring for another of the minor children, acting, according to the social worker, as if the minor child was a parent. The other minor child was having developmental difficulties and the Department referred him to early childhood attachment therapy.

During the next year, respondents continued to use drugs, continued to live with each other and assault one another. Neither respondent attended the programs they were assigned to and neither visited the minor children on a consistent basis. When respondent-father moved to Florida respondent-mother followed him and soon the police became involved with respondents in Florida. Eventually, the Department's recommendation went from reunification to termination. As will be more thoroughly discussed *infra*, the trial court terminated respondent-mother's parental rights while also finding that termination was in the children's' best interests. Respondent-father voluntarily relinquished his parental rights and conceded that termination was in the children's best interests. These appeals ensued.

## II. ANALYSIS

### A. RESPONDENT-MOTHER

In her appeal, respondent-mother first argues that the Department did not make reasonable efforts to reunify her with her children. To preserve a claim premised on the Department's failure to make "reasonable efforts to reunify the child and family," as required under MCL 712A.19a(2), respondent-mother had to challenge the Department's case service plan when the trial court adopted the plan or at some point during the dispositional review process. See *In re Atchley*, ___ Mich App ___, ___; ___ NW2d ___ (2022) (Docket Nos. 358502 and 358503); slip op at 1-2. Respondent-mother did not assert in the trial court that the caseworker did not adequately develop a case service plan and did not otherwise challenge the adequacy of the steps taken to help her rectify the conditions that led to the adjudication. Therefore, she has not preserved this claim of error for appellate review. See *id*.

This Court reviews de novo whether the trial court properly interpreted and applied the relevant statutes and court rules. See *In re Ferranti*, 504 Mich 1, 14; 934 NW2d 610 (2019). This Court reviews for clear error a trial court's finding that the Department established by clear and convincing evidence a ground for termination. See *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010). A finding is clearly erroneous when, even though there is evidence to support it, this Court on the whole record is left with the definite and firm conviction that the trial court made a mistake. *Id*. However, this Court reviews unpreserved claims of error in a termination proceeding under the plain error rule applicable to criminal proceedings. See *In re Beers*, 325 Mich App 653, 677; 926 NW2d 832 (2018). To establish her right to relief under the plain error rule, respondent-mother must show that the trial court committed a plain or obvious error and that the error affected the outcome of the proceedings. See *id*.

The Department must normally make reasonable efforts to "reunify the child and family." MCL 712A.19a(2). As part of that effort, the Department must establish a "case service plan outlining the steps that both it and the parent will take to rectify the issues that led to court involvement and to achieve reunification." *In re Hicks*, 500 Mich 79, 85-86; 893 NW2d 637 (2017). Although the Department has the responsibility to identify and provide services to reunify the parent with his or her child, the parent also has a duty to participate in the services provided and to demonstrate that he or she benefited from the services. See *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012). The Department has the further obligation to make accommodations when a parent has a known or suspected intellectual, cognitive, or developmental impairment. See *In re Sanborn*, 337 Mich App 252, 263-264; ___ NW2d ___ (2021). A parent who challenges the reasonableness of the services or accommodations offered to him or her must demonstrate that, had the additional services been offered, he or she would have fared better. See *id*. at 264.

On appeal, respondent-mother asserts that the Department should have made additional reasonable efforts to reunify her with her children. More specifically, she argues that the Department should have referred her to a second psychological evaluation and should have referred her for a neurological examination. In making these assertions, respondent-mother has not offered any evidence that a second psychological evaluation or neurological examination would have revealed anything beyond that which had already been revealed in the psychological evaluation that Dr. Robert J. Baird performed on her in May 2020.

Dr. Baird stated that he was asked to perform the psychological evaluation in order to determine, in relevant part, whether respondent-mother had any "major psychological or emotional problems." Respondent-mother told Dr. Baird that she suffered a concussion on two occasions, but she did not have medical treatment for them. She also reported that she did not suffer any seizures. She told Dr. Baird that she had not had any psychiatric hospitalizations and suffered only from anxiety and depression. Dr. Baird questioned respondent-mother about her ability to focus, and she reported that she did have some difficulty staying focused, but related that she did well when working alone.

Dr. Baird opined that respondent-mother had experienced anxiety and depression, and complained of difficulty maintaining focus. He noted, however, that respondent-mother reported that she had improved concentration on Adderall and had less anxiety when using Risperdal. After reviewing respondent-mother's test results and reported history, Dr. Baird did not diagnose respondent-mother with mental disorders that might require special accommodations. Rather, he diagnosed her with persistent depressive disorder, generalized anxiety disorder with panic features, opioid use disorder, and alcohol use disorder. Dr. Baird recommended several ways to treat respondent-mother's mental health needs: he recommended that she abstain from substance abuse, obtain substance abuse treatment, comply with her psychotropic medication prescriptions, participate in mental health counseling, and recommended that the case service worker ensure that she completed domestic violence therapy, among other recommendations. The Department provided services to respondent-mother that were consistent with Dr. Baird's recommendations.

The record showed that respondent-mother at various points abused alcohol, cocaine, amphetamine, methamphetamine, and Adderall. There was compelling evidence that her more serious mental health events were caused by her substance abuse. Testimony and evidence showed that respondent-mother's substance abuse significantly affected her ability to function.

-4-

Accordingly, to help her with the problems that arose from her substance abuse, the Department advised respondent-mother that she needed to remain sober, referred her to substance abuse treatment, and asked her to submit to drug screens. Respondent-mother did not follow through with any of these requirements or referrals. Instead, she continued to abuse substances, which caused her to engage in erratic and violent behaviors[2], and likely caused the psychotic episode that she experienced during the pendency of this case. Her failure to participate in substance abuse counseling also caused her to be dropped from the counseling program to which she had been referred.

The Department required respondent-mother to comply with the prescribed medication regime as well. Respondent-mother admitted to Dr. Baird that she benefited from her prescriptions—when she used them—and had less anxiety and better concentration. Yet, she refused to take her prescribed medications at times, and abused prescriptions—such as her prescription for Adderall—on other occasions. Even when she did take her medications, she was inconsistent with her compliance. It was reasonable for the Department to expect respondent-mother to take her prescriptions consistently and as prescribed. Moreover, respondent-mother had a duty to comply with those requirements as a part of her case service plan. See *In re Frey*, 297 Mich App at 248.

A caseworker, Audrey Dodgson, testified that she made accommodations to help respondent-mother on the basis of respondent-mother's history of reporting memory lapses; specifically, Dodgson provided respondent-mother with lots of reminders by text, phone, and letter. Dodgson also reopened referrals for services that had been closed as a result of respondent-mother's nonparticipation so that respondent-mother might have an additional opportunity to participate in the service. Respondent-mother consistently demonstrated that she did not want to participate in any of the services designed to help her overcome her issues with domestic violence and substance abuse. Indeed, the record showed that she regularly prioritized her own desires over the needs of her children.

Dodgson admitted that she observed memory and problem-solving issues with respondent-mother. Dodgson also wondered whether there might be an underlying physiological cause, such as from concussions, or whether the issues might be the result of severe trauma. But Dodgson also acknowledged that there was no indication in the psychological evaluation that respondent-mother had an underlying condition that required accommodation beyond that which Dodgson had been providing. Dodgson additionally wrote in her termination report that there was no evidence that respondent-mother had struggles with her intellectual capacity and noted that others had reported to her that respondent-mother had only recently demonstrated issues with memory and

---

[2] One such example was when respondent-mother's father was living with her to ensure she was safe. While her father was present, respondent-mother was running around the house and stating that she could hear the children crying but could not find them even though the children did not live in that house. She talked to herself, and then ran outside. She tried to get into the barn because, she stated, she could hear the children crying in there. She began to swear, said she was going to harm someone, and started swinging a hammer around. Fearing for his safety and that of respondent-mother, her father called the police department.

communication. As the trial court noted in its findings, the record strongly suggested that respondent-mother's substance abuse and failure to take prescribed medications played the most significant role in her memory and attention issues, as well as her issues with emotional regulation. The services designed to help respondent-mother rectify her issues with substance abuse and to manage her anxiety and depression were highly relevant to rectifying the conditions that led to the adjudication. Consequently, it cannot be said that the Department did not provide reasonable services that were sufficient to rectify the conditions that led to the adjudication of respondent-mother's parental rights had she participated in those services and benefited from them. See *In re Fried*, 266 Mich App 535, 541-543; 702 NW2d 192 (2005) (stating that a claim that the Department did not make reasonable efforts is a challenge to the sufficiency of the evidence that the parent failed to rectify the conditions that led to the adjudication).

In addition to the fact that respondent-mother has not identified any evidence that further assessments would have shed more light on her mental health needs, respondent-mother has not identified any accommodations or services that would have improved her outcome. She repeatedly refused to participate in services. She rejected the contention that she needed counseling for domestic violence, refused to participate in drug counseling, and failed to take her drug screens. She also did not participate in her son's delinquency hearings and did not show for appointments and meetings.

Dodgson additionally testified that she spoke with respondent-mother about the possibility that her memory and thought-processing issues might have a physiological cause or might have been caused by trauma. Dodgson noted that either of those would require different treatments. Dodgson stated, however, that respondent-mother was only occasionally willing to "engage in that conversation and acknowledge some of those things." Dodgson clarified that, when she broached the subject with respondent-mother, respondent-mother would sometimes get offended because she believed Dodgson was asserting that "she can't think" or that she was "crazy." Dodgson indicated that respondent-mother had only just started being receptive to figuring out the underlying cause in July 2021. Dodgson wrote that she even asked respondent-mother's family to encourage her to raise these issues with her doctors, and Dodgson herself offered to take respondent-mother to a doctor's appointment to obtain further neurological assessments; however, respondent-mother denied that she had any problems. Given this record, it is not likely that respondent-mother would have participated in, and benefited from, any additional services. Consequently, she has not established that the outcome would have been different even if the Department had procured the additional assessments, and even if those assessments identified an additional service to which respondent-mother could have been referred. See *In re Sanborn*, 337 Mich App at 264 (stating that the parent challenging the adequacy of the reasonable efforts as the burden to show that the services would have resulted in a better outcome).

Respondent-mother has not identified a plain error warranting relief involving the reasonableness of the Department's efforts to reunify her with the children. See *In re Beers*, 325 Mich App at 677.

Respondent-mother also argues that the trial court clearly erred when it found that termination was in the children's best interests. This Court reviews the trial court's factual findings underlying its application of the law for clear error. See *In re Gonzales/Martinez*, 310 Mich App 426, 430; 871 NW2d 868 (2015); see also MCR 3.977(K). A finding is clearly erroneous when

this Court is left with the definite and firm conviction that a mistake has been made. *In re Gonzales/Martinez*, 310 Mich App at 430-431.

On appeal, respondent-mother again argues that, had she been provided with more services, she would have shown that termination was not in the children's best interests. As already discussed, she has not shown that the Department failed to make reasonable efforts to reunify her with her children. As such, her claims to the contrary are inapposite. She also argues generally that the trial court made errors when it made its findings in support of the children's best interests, but those claims are not supported by the record.

Once the trial court found that the Department established a ground for terminating respondent-mother's parental rights to the children, the trial court had to terminate respondent-mother's parental rights if it also found that termination was in the children's best interests. See MCL 712A.19b(5). The focus is on the child at the best-interest stage of the proceedings—not the parent. See *In re Moss*, 301 Mich App 76, 87; 836 NW2d 182 (2013). When considering the children's best interests, the trial court had to weigh all the evidence and consider a variety of factors:

> To determine whether termination of parental rights is in a child's best interests, the court should consider a wide variety of factors that may include "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption. [*In re White*, 303 Mich App 701, 713-714; 846 NW2d 61 (2014).]

The trial court carefully went through the best-interest factors and found that termination was in the best interests of each child, and the record amply supported the trial court's findings.

The testimony and evidence showed that respondent-mother did not appreciate the significance of her continued participation in domestic violence and the danger that it posed for her children. Rather than work to gain insight into the problems that she had with domestic violence, respondent-mother refused to participate in domestic violence counseling. She told Dodgson that she would rather leave that matter in the past, but the record showed that domestic violence continued to be a problem for her. Evidence showed that respondent-mother was repeatedly involved in domestic violence with respondent-father even after she had been ordered to cease having contact with him. As previously stated, she traveled to Florida to stay with him for weeks and chose not to participate in any services for her children during that time. She also became involved in a domestic violence incident in Florida.

Respondent-mother also continued to abuse substances, which contributed to her emotional and mental instability. She was involved in alcohol-related incidents of violence, and was arrested as a result. Despite the significant effect that substance abuse had on her ability to lead a normal life and parent her children, respondent-mother chose not to participate in services designed to

-7-

help her overcome her issues with substance abuse. She also missed a significant number of screens and tested positive for substances for which she did not have a prescription.

As the trial court recognized, the evidence concerning respondent-mother's continued substance abuse and inability to rectify her problems with mental health and domestic violence demonstrated that she would continue to bring chaos into her children's lives if her rights were not terminated. There was evidence that the former relative caregivers were unable or unwilling to regulate respondent-mother's contacts with the children and that her unauthorized contacts caused stress for the children. By contrast, after the children were removed from their relative caregivers, all three children demonstrated significant improvements. Indeed, Dodgson testified that she was surprised by how well the children had done in such a short time after being removed from their relative caregivers. The evidence that the children did better when no longer exposed to relative caregivers and unauthorized visits supported the trial court's finding that the children's placement with nonrelative caregivers improved their outlook.

There was also evidence to support the trial court's findings that respondent-mother's poor parenting decisions had harmed each child. CH outright refused to engage with respondent-mother during parenting time. MH had developed a need to please everyone and, as the trial court aptly noted, even sought to parent respondent-mother. MH had also assumed the role of parent of AA and met his needs in a way that respondent-mother was unable or unwilling to do. Respondent-mother responded to MH with anger and frustration when respondent-mother was unable to parent AA. The record showed that respondent-mother did not have the ability to properly care for AA, and, to the extent that any of the children had a bond with her, it was a bond formed by shared trauma, which was not a healthy bond for the children. Contrary to respondent-mother's contention on appeal, the record strongly supported the trial court's finding that respondent-mother did not have healthy bonds with the children and that the children were doing better in nonrelative placements because the nonrelative placements were stable.

The trial court recognized that the record showed that respondent-mother had brought only chaos and trauma to the children's lives. The children needed permanence and stability, which they could not have if respondent-mother continued to have any involvement in their lives. The trial court not only found that termination of respondent-mother's parental rights was in the children's best interests, it went so far as to state that there was clear and convincing evidence in support of that finding. The trial court's assessment of the evidence was correct—the record overwhelmingly supported the conclusion that it was in the children's best interests that respondent-mother's parental rights be terminated.

Respondent-mother has not shown that the trial court clearly erred when it found that termination was in the children's best interests. See *In re Gonzales/Martinez*, 310 Mich App at 430-431. Accordingly, respondent-mother is not entitled to relief.

## B. RESPONDENT-FATHER

Respondent-father argues on appeal that the trial court erred when it terminated his parental rights because he did not knowingly and voluntarily relinquish his parental rights. To preserve an issue for appellate review, the issue must have been raised in the trial court. *In re Utrera*, 281 Mich App 1, 8-9; 761 NW2d 253 (2008). Respondent-father did not challenge in the trial court

the trial court's decision to accept his decision to voluntarily relinquish his parental rights by signing the amended petition. Therefore, he has not preserved this claim of error for appellate review. See *id*. Because he did not preserve this claim of error for appellate review, this Court's review is limited to determining whether respondent-father has established a plain error affecting his substantial rights. See *In re Beers*, 325 Mich App at 677. To establish his right to relief under the plain error rule, respondent-father must show that the trial court committed a plain or obvious error when it accepted his release of parental rights. See *id*.

At the adjudication stage of a termination proceeding, a trial court may not accept a plea of admission or no contest without first being satisfied that the parent's plea was knowingly, understandingly, and voluntarily made. See MCR 3.971(D)(1); see also *In re Pederson*, 331 Mich App 445, 464-465; 951 NW2d 704 (2020). The court must also advise the parent about the rights that he or she will be relinquishing by making the plea. See MCR 3.971(B). More generally, a waiver of a constitutional right must be done with sufficient awareness of the relevant circumstances and likely consequences that the parent can be said to have knowingly and voluntarily acted. See *In re Pederson*, 331 Mich App at 464. Assuming that the requirements of MCR 3.971 apply by analogy to termination hearings, the record in this case does not support respondent-father's contention that his decision was not knowingly, understandingly, and voluntarily made after being properly advised of his rights.

Respondent-father became emotional at various points throughout the termination hearing and eventually his lawyer indicated that respondent-father did not want to hear any more testimony. He stated that respondent-father wanted to relinquish his parental rights. When the trial court asked him about his change of heart, respondent-father stated that his lawyer told him that he was going to lose his parental rights anyway. The trial court informed respondent-father that that was just his lawyer's opinion. The trial court then swore in respondent-father and asked him some questions. The court advised respondent-father that he had the right to continue with the hearing, that that right included the right to representation, the right to present evidence, and the right to cross-examine witnesses. The court reminded him that the Department had the burden of proof as well. Finally, the court explained that there were two phases to the hearing: a phase concerning whether the grounds for termination had been proved and a phase to determine the children's best interests. The court warned respondent-father that if he chose to relinquish his parental rights, he would no longer have the right to hold the Department to its burden of proof. The court also explained that he would no longer have certain rights concerning the upbringing of his children. He would, however, have to continue to pay child support until the children were adopted. Respondent-father testified that he understood all these things.

Respondent-father then testified that no one had made him any promises in exchange for his decision to sign the amended petition, and he agreed that he had had time to discuss the matter with his lawyer. Respondent-father then conceded that 182 days or more had passed since the adjudication, agreed that the conditions that led to the adjudication continued to exist, and agreed that there was no reasonable likelihood that the conditions would be rectified within a reasonable time. He then affirmed that it was in his children's best interests that the trial court terminate his parental rights. After respondent-father signed an amendment agreeing to these things, the trial court found that he had freely, voluntarily, and understandingly signed the amendment to the petition for termination. The trial court then informed respondent-father about his appellate rights.

The trial court's colloquy adequately advised respondent-father of his right to hold the Department to its burden of proof and to contest the termination at a continued hearing. The court also properly advised him of the consequences of his decision to concede that the Department had established grounds for termination and that termination was in the children's best interests. Respondent-father agreed that he understood his rights, agreed that he understood the consequences of his decision, and agreed that the Department had met its burden on both the ground for termination and the children's best interests. He also testified that he had not been coerced into making these agreements and knew that he could not be forced to do so. He then verified everything that he had stated on the record by signing an amended petition that conceded that the Department had established grounds for terminating his parental rights under MCL 712A.19b(3)(c)(*i*) and that termination was in the children's best interests. This record established that respondent-father's decision was knowingly, understandingly, and voluntarily made. See *In re Pederson*, 331 Mich App at 464.

On appeal, respondent-father maintains that the trial court effectively coerced him into relinquishing his rights by questioning him after he expressed hesitancy to relinquish his rights on the record. The cited exchange does not, however, suggest that respondent-father's decision was not knowingly and voluntarily made.

After he agreed that the Department had established grounds to terminate his parental rights under MCL 712A.19b(3)(c)(*i*), the trial court asked respondent-father whether he had "come to the difficult and loving conclusion that the best interests of your children . . . would be served through the termination of your parental rights?" Respondent-father responded: "I don't want how [sic] to answer that one." The trial court then asked him whether he understood how long things had been proceeding without any improvement. Respondent-father stated: "I just don't feel it's best for them to—they need their dad. They need their parents." The trial court said that, if that were the case, it would have liked to have seen more progress with respondent-father's parent-agency agreement. Respondent-father stated that he wished things had been different and that he was out of jail. Thereafter, he again testified that he did not think that he could rectify the conditions within a reasonable time. He then agreed that it was in his children's best interests to terminate his parental rights and stated "yes" when asked whether he wanted to voluntarily release is parental rights.

Rather than demonstrate respondent-father was coerced by the trial court to relinquish his parental rights, this exchange revealed that respondent-father was reluctant to admit that his children would be better off without him. Additionally, he conceded he had not made progress on his case service plan while agreeing that termination was in the children's best interests. Immediately thereafter, he restated he wanted to release his parental rights. He then signed the amended petition. Nothing in this exchange suggests that respondent-father's will had been overwhelmed such that his decision could not be said to have been the product of a free and deliberate choice. See, e.g., *People v Garwood*, 205 Mich App 553, 556; 517 NW2d 843 (1994) (stating that one voluntarily waives a constitutional right when the decision was the product of a free and deliberate choice rather than intimidation, coercion, or deception), lv den 447 Mich 1040 (1994).

Respondent-father has not demonstrated that the trial court plainly erred when it accepted his decision to concede that the Department established grounds for termination and that

termination was in his children's best interests. See *In re Beers*, 325 Mich App at 677. Accordingly, he is not entitled to relief.

Affirmed in both dockets.

/s/ Michael J. Riordan
/s/ Stephen L. Borrello
/s/ Anica Letica