*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* BAUERLE/EVANS, Minors.

UNPUBLISHED
April 21, 2022

No. 358331; 358550
Lenawee Circuit Court
Family Division
LC No. 19-000427-NA

Before: JANSEN, P.J., and SAWYER and RIORDAN, JJ.

PER CURIAM.

In these consolidated appeals, respondent, the mother of BVB and ABE: (1) appeals by delayed leave granted[1] the trial court's March 1, 2021 order finding that it was contrary to the welfare of BVB and ABE to be placed in respondent's home; and (2) appeals as of right the initial order of disposition following adjudication of the children. We affirm.

## I. FACTS

At the time petitioner Department of Health and Human Services became involved with respondent mother's family, BVB was 12 years old, and ABE was seven years old. Petitioner petitioned for temporary custody of BVB, ABE, and their older sister, CB, on the basis of allegations including that respondent cut BVB's hair as punishment, previously used a belt to punish her children, and requested her two daughters, who she called "sociopaths," be removed from her care because the sight of them made her "sick." In contrast, respondent considered her son, ABE, an "angel." The petition also noted that another, older daughter, DB, had previously been removed from respondent's care because of a report that respondent punched DB repeatedly in the face and cut DB's hair as punishment. Further, respondent's mother, V. Hill, reported that respondent tried to break down Hill's door, where some of the children were staying.

---

[1] We granted leave to appeal in Docket No. 358331 and consolidated the two appeals. *In re Bauerle/Evans Minors*, unpublished order of the Court of Appeals, entered October 13, 2021 (Docket No. 358331).

The trial court authorized the petition and ordered the children removed from respondent's home. A trial on the issue of jurisdiction was significantly delayed because respondent wished to exercise her right to trial by jury, and jury trials were suspended because of Covid-19. After about 10 months awaiting trial, respondent requested that the trial court reconsider the continued removal of the children from respondent's home. The trial court agreed to reconsider the issue, but ruled that it was still contrary to the children's welfare to be placed in respondent's home. A jury trial was eventually held, and the jury found, by a preponderance of the evidence, that there were grounds for asserting jurisdiction over BVB and ABE.[2]

## II. CONTINUED REMOVAL OF THE CHILDREN FROM RESPONDENT'S HOME

Respondent mother argues that the trial court erred by not returning her children to her home in March 2021, pending trial. We disagree.

In the context of removal of children from their parent's home, "[a] trial court's factual findings are reviewed for clear error. A finding is only clearly erroneous if an appellate court is left with a definite and firm conviction that a mistake has been made." *In re Benavides*, 334 Mich App 162, 167; 964 NW2d 108 (2020) (citations and quotation marks omitted). "We review the interpretation and application of statutes and court rules de novo. Whether child protective proceedings complied with a parent's right to due process presents a question of constitutional law, which we also review de novo."[3] *In re Ferranti*, 504 Mich 1, 14; 934 NW2d 610 (2019) (citations omitted).

Respondent appeals the trial court's March 1, 2021 order. This order was the third in a series of three orders in which the trial court made renewed findings that it was contrary to the children's welfare to be in respondent's home. Recognizing the seriousness of the children's prolonged pretrial removal from home, the trial court, at respondent's request in October 2020, undertook a reassessment of whether the children could be returned to respondent's home. On November 6, 2020, the trial court made new contrary-to-the-welfare findings, but indicated that it would reassess the case in 30 days because respondent was to voluntarily undergo a mental health evaluation. On December 16, 2020, the trial court again made a contrary-to-the-welfare finding,

---

[2] CB had already reached 18 years of age.

[3] Respondent mentions "due process rights" in the headings and question presented in her brief on appeal, but makes no argument specifically with regard to due-process rights, and no argument that proper procedures were not followed. See *In re Sanborn*, ___ Mich App ___, ___; ___ NW2d ___ (2021) (Docket No. 354915); slip op at 5 ("In Michigan, procedures to ensure due process to a parent facing removal of his child from the home or termination of his parental rights are set forth by statute, court rule, DH[H]S policies and procedures, and various federal laws . . . .") (citation and quotation marks omitted).

As such, it appears that any due-process argument collapses into her argument that it was safe for the children to be returned to respondent. Any other intended due-process argument is clearly abandoned. See *Matter of Toler*, 193 Mich App 474, 477; 484 NW2d 672 (1992) ("A party may not merely announce his position and leave it to us to discover and rationalize the basis for his claim.").

and noted that respondent's mental health evaluation had not yet been made available to the parties or the court, and respondent had unmet mental health needs. Finally, on March 1, 2021, the trial court noted that respondent's mental health evaluation had been received, but respondent had so far only attended a single therapy session—which was insufficient to alleviate the risk to the children—and the trial court again made a contrary-to-the-welfare finding.

Respondent generally argues that it was safe for the children to be returned to her in March 2021, without identifying specific rules which she believes the trial court violated. Removing a child from his or her parent's home is a grave decision which can have consequences for the rest of the case. See *In re Williams*, 333 Mich App 172, 184-185; 958 NW2d 629 (2020). The children were initially placed with a relative—Hill. As of March 1, 2021, CB had turned 18 years old, and BVB and ABE had both been placed in a licensed foster home. BVB had been through several placements by this time.

> If the trial court orders placement of the child in foster care, it must make explicit findings that "it is contrary to the welfare of the child to remain at home," MCR 3.965(C)(3), and "reasonable efforts to prevent the removal of the child have been made or that reasonable efforts to prevent removal are not required," MCR 3.965(C)(4). [*In re Benavides*, 334 Mich App at 168.[4]]

These findings must be made by a preponderance of the evidence. See *In re Williams*, 333 Mich App at 183-184 (applying preponderance of the evidence standard to contrary-to-welfare findings).

Respondent's argument essentially challenges the trial court's finding that, as of March 1, 2021, it was contrary to ABE's and BVB's welfare to be placed back with respondent. Under MCL 712A.13a(17), "[u]pon the motion of any party, the court shall review custody and placement

---

[4] The trial court must make five findings to initially place a child in foster care:

> (a) Custody of the child with the parent presents a substantial risk of harm to the child's life, physical health, or mental well-being.

> (b) No provision of service or other arrangement except removal of the child is reasonably available to adequately safeguard the child from risk as described in subdivision (a).

> (c) Continuing the child's residence in the home is contrary to the child's welfare.

> (d) Consistent with the circumstances, reasonable efforts were made to prevent or eliminate the need for removal of the child.

> (e) Conditions of child custody away from the parent are adequate to safeguard the child's health and welfare. [MCL 712A.13a(9).]

Respondent does not challenge the *initial* removal of the children, or argue any of these requirements specifically were not met, except insofar as she argues it would have been safe for the children to be placed in her home in March 2021.

orders and initial services plans pending trial and may modify those orders and plans as the court considers under this section are in the juvenile's best interests."

The trial court did not clearly err by finding that it was contrary to ABE's and BVB's welfare to be placed in respondent's home as of March 1, 2021. There was evidence respondent spent time with BVB unsupervised in violation of the parenting time orders in October 2020. On November 6, 2020, the trial court found that respondent had outstanding unmet mental health needs, and that "[s]ince removal, there have been additional evidence of instability, including assaultive behavior, destruction of property and verbal assaults against the relative placement, resulting in the request of the relative to have her grandchildren removed from her care." Respondent does not challenge this finding, or the subsequent finding that respondent repeatedly violated a court order prohibiting her from "invading" Hill's home.

At the March 1, 2021 pretrial hearing, there was testimony the foster parents caring for ABE and BVB had recently requested that the children be removed from their home because, among other things, respondent called law enforcement reporting ABE was being abused by another child in the home. Respondent's complaint was not substantiated by CPS. Respondent had just started therapy and had attended a single visit in February 2021, after undergoing a mental health evaluation in November 2020. A foster care supervisor testified that the November evaluation strongly recommended respondent undergo therapy and medication management.

During the hearing, despite repeated guidance from the trial court, respondent focused on petitioner's failings rather than on respondent's ability to safely care for the children. The trial court noted that respondent took a long time to get her psychological evaluation taken care of, which respondent attributed to Covid-19-related closings and delays. Respondent did not believe that her behavior was irrational and believed that "[t]he only condition" she had was "being nervous around people, really." Respondent tried about six times to unmute herself on Zoom and interrupt the trial court, which the trial court noted showed a lack of self-control even when dealing with adults in public, suggesting an inability to safely parent her children.

At a March 1, 2021 hearing, there also was evidence the children wanted to return home to respondent, and the main witness for petitioner had trouble answering some basic questions about the children and their then-current placement. The trial court also acknowledged that some of respondent's concerns about the foster home raised valid points.

Overall, given the evidence respondent had only just started the "strongly recommended" therapy, that she demonstrated a continuing lack of self-control in court, downplayed her responsibility and issues in favor of attacking others in court, failed to follow court orders with regard to time with the children and staying away from placements, and had repeatedly interfered with the children's placements since their removal, we are not definitely and firmly convinced that the trial court erred by holding it would be contrary to the children's welfare to be returned to respondent's home as of March 1, 2021. As such, respondent's argument fails.

## III. ADJUDICATION

The jury found, by a preponderance of the evidence, that BVB and ABE were each subject to a substantial risk of harm to their mental well-being, providing a basis for jurisdiction under

MCL 712A.2(b)(1).[5]  Respondent argues that insufficient evidence supported these findings, and that the trial court should have directed a verdict against petitioner.  We disagree.

## A.  STANDARD OF REVIEW

We review respondent's sufficiency-of-the-evidence argument for clear error.  See *In re Kellogg*, 331 Mich App 249, 253; 952 NW2d 544 (2020).  "To properly exercise jurisdiction, the trial court must find that a statutory basis for jurisdiction exists . . . by a preponderance of the evidence." *In re BZ*, 264 Mich App 286, 295; 690 NW2d 505 (2004) (citation omitted).  This Court reviews the "decision to exercise jurisdiction for clear error in light of the court's findings of fact." *Id*.  "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *Id.* at 296-297.  "Statutory interpretation is a question of law reviewed de novo on appeal." *In re Ramsey*, 229 Mich App 310, 314; 581 NW2d 291 (1998).

Respondent did not raise her directed-verdict argument in the trial court, so our review is for plain error.  See *In re TK*, 306 Mich App 698, 703; 859 NW2d 208 (2014) ("In general, issues that are raised, addressed, and decided by the trial court are preserved for appeal."); *In re Beers*, 325 Mich App 653, 677; 926 NW2d 832 (2018) ("Generally speaking, in termination proceedings, we review unpreserved claims under the plain-error rule.").  On plain-error review, a respondent "must establish that (1) error occurred; (2) the error was 'plain,' i.e., clear or obvious; and (3) the plain error affected . . . substantial rights." *In re Ferranti*, 504 Mich at 29.  "[A]n error affects substantial rights if it caused prejudice, i.e., it affected the outcome of the proceedings." *In re Utrera*, 281 Mich App 1, 9; 761 NW2d 253 (2008).  In addition, "the error must have seriously affected the fairness, integrity or public reputation of judicial proceedings." *In re Ferranti*, 504 Mich at 29 (cleaned up).

## B.  ANALYSIS

"While the adjudicative phase is only the first step in child protective proceedings, it is of critical importance because '[t]he procedures used in adjudicative hearings protect the parents from the risk of erroneous deprivation' of their parental rights." *In re Sanders*, 495 Mich 394, 405-406; 852 NW2d 524 (2014) (citation omitted).  As relevant here, Michigan courts have:

> (b) Jurisdiction in proceedings concerning a juvenile under 18 years of age found within the county:

---

[5] Additionally, the jury found that respondent's home was unfit for BVB by reason of respondent's neglect, cruelty, drunkenness, criminality or depravity, providing a basis for jurisdiction under MCL 712A.2(b)(2).  However, establishment of only one ground is necessary for the assumption of jurisdiction over a child.  See *In re Sanders*, 495 Mich 394, 405; 852 NW2d 524 (2014) ("[T]he petitioner has the burden of proving by a preponderance of the evidence one or more of the statutory grounds for jurisdiction alleged in the petition[.]").  Given our conclusion about MCL 712A.2(b)(1), we therefore need not address this ground.

(1) Whose parent . . . when able to do so, neglects . . . to provide proper or necessary support, education, medical, surgical, or other care necessary for his or her health or morals, [or] who is subject to a substantial risk of harm to his or her mental well-being . . . . [MCL 712A.2(b)(1).]

MCL 712A.2 "speaks in the present tense, and, therefore, the trial court must examine the child's situation at the time the petition was filed." *In re MU*, 264 Mich App 270, 279; 690 NW2d 495 (2004). "The fact that there are statutory grounds to assume jurisdiction over one minor child does not automatically mean that there are statutory grounds to assume jurisdiction over a second minor child." *In re Kellogg*, 331 Mich App at 254.

"Neglect" for the purposes of MCL 712A.2(b)(1) is defined as follows:

"Neglect" means harm to a child's health or welfare by a person responsible for the child's health or welfare that occurs through negligent treatment, including the failure to provide adequate food, clothing, shelter, or medical care, though financially able to do so, or the failure to seek financial or other reasonable means to provide adequate food, clothing, shelter, or medical care. [MCL 722.602(d).]

In keeping with this definition, "there must be a showing of harm in order for a court to assume jurisdiction over a juvenile under the 'neglects' clause of MCL 712A.2(b)(1)." *In re Smith*, 507 Mich 905, 905 (2021). Evidence of such harm cannot be merely speculative, *id.*, but may be inferred from the circumstances in at least some instances. *Id.* at 905 n 1.[6]

Respondent argues that evidence of actual harm to the children was required in this case under *In re Smith*, but this argument is mistaken because the statutory ground found to be supported by the jury did not require such a showing. MCL 712A.2(b)(1) provides "a number of alternative grounds for taking jurisdiction." *In re Baham*, 331 Mich App 737, 746; 954 NW2d 529 (2020). The MCL 712A.2(b)(1) ground presented to, and found to be supported by, the jury was that both BVB and ABE were "subject to a substantial risk of harm to [their] mental well-being." This finding did not require a showing of "neglect" by respondent. Therefore, the harm requirement for a finding of "neglect" discussed in *In re Smith* is not relevant. Instead, the jury's verdict in this case required a preponderance of the evidence to show that there was a substantial risk of harm to each child's mental well-being.

In *In re Kellogg*, 331 Mich App at 258 (citation and quotation marks omitted), we cautioned: "[T]he fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents . . . ." (Citation and quotation marks omitted.) In that case, we held the facts that a parent had some

---

[6] The Court noted that *In re Nash*, 165 Mich App 450; 419 NW2d 1 (1987), "did not involve chronic absences without a showing of harm" because in that case "in addition to the children's absences from school, the respondent had no stable residence and one of the children was born with symptoms of a drug overdose," thus implying that the lack of stable residence could itself be evidence of harm. *In re Smith*, 507 Mich at 905 n 1.

mental health challenges, sometimes yelled and swore at a three-year-old child, and had some difficulty managing the child were insufficient to support jurisdiction under MCL 712A.2(b)(1) and (2).[7] *Id.* at 256-258.

In this case, DB testified that respondent seriously physically and verbally abused her on an ongoing basis, and cut DB's hair as punishment on two occasions. Hill testified that respondent frequently called respondent's daughters derogatory names in a manner that appeared intended to be hurtful, and testified that BVB was upset by her haircut and wanted Hill to call the police when it happened. Hill also testified about an incident, apparently about seven months before the petition was filed, in which BVB reported respondent shoved cake into BVB's face. A CPS worker testified that respondent called BVB a whore and a slut, appeared erratic when talking about her daughters' faults, and said that she wanted her daughters removed. The worker reported that respondent said that the haircut was part of "a power struggle" with BVB.

Regarding the risk to the children's mental well-being, a CPS worker testified that "the kids" reported that they were concerned by respondent's behavior and how she spoke to them, and that "the children" told the worker respondent needed to address her mental health issues. BVB testified that she spent nearly all her time outside school and organized activities with respondent and ABE—suggesting that respondent's actions would have a significant impact on BVB and ABE. BVB testified that she hated when respondent went out without BVB, and BVB would wonder where respondent was.

DB testified that respondent's behavior toward DB severely impacted DB's mental health. CB's reply to a question from respondent suggested that respondent displayed erratic behavior:

> *Q.* Has your mother ever exhibited erratic behavior in public or even really at home that didn't—have I ever started yelling or been angry for no reason?
>
> *A.* No, most of it could be rationalized.

The jury was entitled to believe all of this testimony, and was in the best position to weigh the credibility of the various witnesses. Credibility was of particular importance in this case because the children testified about respondent, their mother, in front of her and, except for ABE, in response to questioning directly by her. Whether the children were influenced by their mother's presence or their desire to return home was an important factor regarding how much to credit their testimony.

Respondent's own testimony corroborated that she called her daughters "sociopaths," though she testified that this was playful. Respondent admitted calling CB and BVB "fake," and repeated on the stand that her children were spoiled and mean—it is unclear if this included ABE.

---

[7] Specifically, the grounds at issue were "neglect[] to provide care necessary for the children's health or morals" under MCL 712A.2(b)(1), and unfitness of the home by reason of neglect and depravity under MCL 712A.2(b)(2). *In re Kellogg*, 331 Mich App at 254. However, this Court also referenced the "substantial risk of harm" prong of MCL 712A.2(b)(1), and appeared to hold such a showing was required. *Id.* at 256-257.

Respondent wanted her daughters to be threatened by a court and sent to "Campus" to make them behave better. Respondent described herself as spoiling her children, having trouble disciplining them, and giving them everything they wanted.

Respondent's own testimony and questioning also at times suggested a fixation on the wrongs or slights of others—especially Hill and DB—rather than on concern or care for her children. Respondent at times appeared more concerned about her family's reputation than her daughter's safety when testifying about DB's sexual activities or questioning others about them. Respondent repeatedly tried to question DB about whether she offered "sexual favors" on the internet. Respondent's own testimony and conduct could be interpreted as suggesting callousness toward her children, which the jury could have inferred increased the likelihood she treated them cruelly behind closed doors. Respondent also admitted that she might have been acting more irrationally, and might have been more short-tempered and frustrated than usual, near the time the petition was filed because of her hand surgery and the effect of her antidepressants.

The jury was entitled to believe all of this evidence and to disbelieve testimony to the contrary. The jury was also entitled to use respondent's treatment of her older children as evidence of how she was treating, or was likely to treat, her younger children. *In re BZ*, 264 Mich App at 296 (approving application of anticipatory neglect inference at the jurisdictional stage). Under the doctrine of anticipatory neglect, "[h]ow a parent treats one child is certainly probative of how that parent may treat other children." *In re LaFlure*, 48 Mich App 377, 392; 210 NW2d 482 (1973). See also *Matter of Jackson*, 199 Mich App 22, 24, 26; 501 NW2d 182 (1993) (holding that "the court properly weighed respondent's treatment of her oldest son in considering whether to terminate her parental rights" to her other children, when the respondent previously lost her rights to her oldest son because of abuse and neglect).

We acknowledge that there was no evidence respondent was physically harming the children at the time of the petition. While MCL 712A.2(b)(2) requires only a *substantial risk* of harm to mental well-being, rather than harm itself, we also acknowledge that there was little evidence directly aimed at showing respondent's behavior was creating a substantial risk of harm—for example, no mental health experts testified. The children at issue both testified they wanted to be at home rather than in foster care. Nonetheless, the jury was entitled to make inferences about the risk to the children's mental health on the basis of the trial testimony and the jury's observations of the witnesses.

Overall, especially given the deference owed to the jury's role in assessing witness credibility, *In re BZ*, 264 Mich App at 296-297, we are not definitely and firmly convinced the jury erred in finding by a preponderance of the evidence there was a substantial risk to both BVB's and ABE's mental well-being. If the jury credited all the evidence against respondent, there was a severe history of physical and emotional abuse by respondent with regard to DB. The jury could have believed respondent was behaving erratically around BVB and ABE, simultaneously spoiling them, while also calling BVB and her older siblings derogatory names, at times punishing her older children harshly, and expressing outright animosity toward the older children. While there was testimony respondent considered ABE an "angel" and "perfect," the jury could have concluded such sentiments would not protect ABE, and might even have been an ominous sign, given the evidence of close but fraught relationships between respondent and her other children.

In addition to allowing credibility assessments, observing the witnesses gave the jury some basis for judging the impact of respondent's behavior on the children, including ABE, and for judging whether respondent's behavior crossed a line from merely unusual and imperfect parenting to behavior creating a substantial risk to the children's mental well-being. In this case, the jury was given a first-hand look at the dynamic between respondent and several of her children, because respondent herself questioned BVB, DB, and CB in court.

Given the jury's opportunity to observe the witnesses and family dynamics in this case, we are not definitely and firmly convinced that the jury made a mistake in finding by a preponderance of the evidence there was a substantial risk of harm to both BVB and ABE's mental well-being. As such, the trial court did not clearly err in asserting jurisdiction over the minor children on the basis of MCL 712A.2(b)(1).

Respondent also argues that there was a failure by the trial court, or respondent's attorney advisor, to advise respondent to seek a directed verdict. Respondent chose to represent herself. Respondent does not argue that her waiver of her right to counsel was inadequate, and does not attempt to argue that she was denied effective assistance of counsel. Respondent also provides no support for her argument that the trial court should have sua sponte suggested a directed verdict. MCR 2.516, the rule cited by respondent, only provides parties the right to move for a directed verdict—it does not place any burden on the trial court to suggest a directed verdict. Moreover, denying a motion for a directed verdict is not an error when the evidence would be sufficient to support a contrary verdict. See *Matter of Harmon*, 140 Mich App 479, 483; 364 NW2d 354 (1985). Respondent has failed to demonstrate any error, let alone plain error, with regard to the failure to grant an unrequested directed verdict.

## IV. CONCLUSION

The trial court did not err by finding that it was contrary to the welfare of BVB and ABE to be placed in respondent's home or by exercising jurisdiction over the children consistent with the jury's verdict. We affirm.

/s/ Kathleen Jansen
/s/ David H. Sawyer
/s/ Michael J. Riordan