*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* ROLSTON/LUNA, Minors.

UNPUBLISHED
May 12, 2025
10:29 AM

Nos. 371731; 371733
Chippewa Circuit Court
Family Division
LC No. 23-015102-NA

Before: O'BRIEN, P.J., and K. F. KELLY and BORRELLO, JJ.

PER CURIAM.

In these consolidated appeals,[1] respondents appeal by right the trial court's orders terminating their parental rights to the minor children, AR and AL, under MCL 712A.19b(3)(c)(*i*) (failure to rectify conditions that led to adjudication) and MCL 712A.19b(3)(j) (reasonable likelihood that child will be harmed if returned to parent). Finding no errors warranting reversal, we affirm.

## I. BASIC FACTS AND PROCEDURAL HISTORY

In 2022, petitioner Department of Health and Human Services ("DHHS") investigated complaints that AR was often dirty, his diaper was never changed, he had bleeding diaper rash, and he was not being fed appropriately. During the investigation, Children's Protective Services ("CPS") substantiated complaints of improper supervision and substance abuse. As a consequence, CPS opened an "ongoing" case to assist respondents with substance abuse, mental health, housing, and parenting issues. At the time of the investigation, AR was approximately three months old and AL had yet to be born.

After respondent-mother gave birth to AL, concerns for the children's safety remained and grew amidst evidence of neglect, domestic violence, physical violence, substance abuse, mental

---

[1] *In re Rolston/Luna*, unpublished order of the Court of Appeals, entered September 10, 2024 (Docket Nos. 371731 and 371733).

health concerns, and housing instability. Respondents' home smelled of urine and was littered with garbage, animal feces, and cigarette butts. Consequently, DHHS paid for the family to stay in a hotel room and filed a petition requesting that the court take in-home jurisdiction over the children. However, when circumstances became untenable, DHHS petitioned the court to take temporary jurisdiction and remove the children from respondents' care. Initially, the children were placed in a tribal foster home but were subsequently moved to a licensed foster home where the foster father was a member of the Sault Ste. Marie Tribe of Chippewa Indians ("Sault Tribe").

Respondents entered pleas admitting that they suffered from mental health issues that impaired their ability to care for the children, and the trial court assumed jurisdiction over the children. During the dispositional hearing that followed, the court ordered respondents to comply with a treatment plan designed to address their mental health issues, substance abuse concerns, domestic violence, and poor parenting skills. Respondents were required to participate in, among other things, substance abuse treatment, drug screens, parenting classes, parenting time, and mental health treatment.

In April 2024, DHHS petitioned the trial court to terminate respondents' parental rights. The termination hearings were held in May and June 2024. At the conclusion of these hearings, the trial court concluded that there was a statutory basis to terminate respondents' parental rights under MCL 712A.19b(3)(c)(*i*) and (j), and that termination of respondents' parental rights was in the best interests of the children. This appeal followed.

## II. STANDARDS OF REVIEW

"In order to terminate parental rights, the trial court must find by clear and convincing evidence that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been met." *In re VanDalen*, 293 Mich App 120, 139; 809 NW2d 412 (2011). This Court reviews for clear error a trial court's findings of fact. *In re McCarrick/Lamoreaux*, 307 Mich App 436, 463; 861 NW2d 303 (2014). A finding is clearly erroneous if this Court is left with a definite and firm conviction that the trial court made a mistake. *Id*.

"Issues involving the application and interpretation of ICWA[2] are questions of law that are reviewed de novo." *In re Morris*, 491 Mich 81, 97; 815 NW2d 62 (2012). Similarly, this Court "review[s] de novo issues involving the interpretation and application of MIFPA.[3]" *In re Detmer/Beaudry*, 321 Mich App 49, 59; 910 NW2d 318 (2017).

### III. DOCKET NO. 371731: RESPONDENT-FATHER

#### A. ACTIVE EFFORTS

---

[2] Indian Child Welfare Act, 25 USC 1901 *et seq*.

[3] Michigan Indian Family Preservation Act, MCL 712B.1 *et seq*.

Respondent-father first argues that the trial court erred when it determined that DHHS satisfied its duty to make active efforts to prevent the breakup of the family and to reunify him with his children. We disagree.

AR was enrolled—and AL was eligible to enroll—as a member of the Sault Tribe and are, therefore, Indian children such that the additional procedural and substantive provisions of the Indian Child Welfare Act ("ICWA"), 25 USC 1901 *et seq.*, and the Michigan Indian Family Preservation Act ("MIFPA"), MCL 712B.1 *et seq.*, applied to these proceedings. See 25 USC 1903(4); MCL 712B.3(k). In proceedings involving termination of parental rights, ICWA and MIFPA "require a dual burden of proof." *In re Payne/Pumphrey/Fortson*, 311 Mich App 49, 58; 874 NW2d 205 (2015). Under this system, in addition to finding that at least one state statutory ground for termination has been proven by clear and convincing evidence, a trial court must also make additional findings required by ICWA and MIFPA before terminating parental rights. *In re England*, 314 Mich App 245, 253; 887 NW2d 10 (2016).

> The specific findings required by the ICWA and the MIFPA in termination proceedings are: (1) proof that active efforts were made to prevent the breakup of the family; and (2) proof beyond a reasonable doubt that the continued custody of the child by the parent would likely result in serious emotional or physical damage to the child. [*Id*. (citations omitted).]

The court must find by clear and convincing evidence that active efforts have been made to prevent the breakup of the family before terminating parental rights. *Id*. at 259. The court has defined active efforts as

> actions to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and to reunify the Indian child with Indian family. . . . Active efforts require affirmative, as opposed to passive, efforts, and active efforts require more than the standard reasonable-efforts approach. Active efforts require more than a referral to a service without actively engaging the Indian child and family. Active efforts entail a caseworker taking a client through the steps of a treatment plan rather than requiring the client to perform the plan on his or her own. [*Beers/Lebeau-Beers Minors*, 325 Mich App 653, 680; 926 NW2d 832 (2018) (quotation marks and citation omitted).]

DHHS also has an obligation to service the case in a way that is culturally sensitive. *In re JL*, 483 Mich 300, 322-323; 770 NW2d 853 (2009) (citation omitted). DHHS should use available resources from the "extended family, the tribe, Indian social service agencies and individual Indian care givers." *Id*.

Before the children were removed from respondents' care, DHHS worked with the family for approximately 11 months to avoid court intervention and prevent removal of the children. During its ongoing case, CPS offered respondents assistance through a multitude of community and tribal agencies. In particular, ACFS, an agency providing social services to the Sault Tribe, provided assistance through its Family Continuity Program. In addition, CPS provided bus passes, transportation, and other financial assistance. After respondent-mother gave birth to AL in early 2023, DHHS initially petitioned the court in February 2023 for in-home jurisdiction. DHHS was

attempting to avoid breaking up the family by keeping the children in the home. Only when the circumstances became completely unacceptable did DHHS petition the court in March 2023 to remove the children. After DHHS filed the removal petition, the foster-care worker held a family team meeting that include respondents and representatives from DHHS and ACFS. During this meeting, the agencies discussed with respondents the reunification goals. Shortly thereafter, respondent-father was arrested and transported to Clare County.

In addition, a treatment plan was developed in an effort to address the barriers to reunification. Respondents' caseworkers made referrals using, among other things, tribal resources and Indian social service agencies. When respondent-father returned in July 2023, DHHS offered him in-person parenting time, but respondent-father did not regularly attend the visits with his children. Subsequently in August 2023, respondents voluntarily decided to leave Chippewa County and relocate downstate, hundreds of miles and several hours away from their children.

In a continued effort to assist respondents, DHHS requested courtesy supervision in two other counties.[4] When respondents moved to Clinton County, for example, Samantha Salyer was assigned to work with respondents while they were living there. However, respondents did not cooperate with Salyer's efforts to meet with them. Salyer expended emergency funds from her county and went through extensive efforts to arrange respondents' travel back to Chippewa County; however, respondents abruptly abandoned these plans in the middle of the night and decided to relocate to Clio, Michigan.

When respondent-father finally made the decision in late December 2023 to leave Clio and return to Chippewa County, he was provided gas cards by DHHS. Respondent-father was arrested shortly after he returned to Chippewa County and transported to Tuscola County to face charges related to his failure to comply with reporting requirements of the Sexual Offender Registration Act ("SORA"), MCL 28.721 *et seq*. When respondent-father returned to Chippewa County in early 2024, DHHS again referred respondent-father for hands-on assistance from AFCS family continuity worker, Megan Rogers.

In addition, Amanda Gil, an ICWA monitor for the Sault Tribe, testified as an expert that DHHS had made active efforts to provide remedial services to respondent-father, but that these efforts were unsuccessful in removing the barriers to reunification. Gil explained that extensive services were offered to respondents that included community and tribal resources. She further found that the services addressed respondents' needs, including housing, employment, budgeting, mental health treatment, and substance abuse treatment. Gil noted that a lot of hands-on assistance was given to respondents by multiple agencies and could not identify any other services that should have been provided but were not.

Given this evidence, the trial court did not clearly err when it found that active efforts had been made, that respondent-father refused to participate in services, and that further efforts would

---

[4] A courtesy worker in a third county would have been provided, but respondents refused to disclose their address to the caseworker.

not likely be successful in removing the barriers to reunification. The record demonstrates that DHHS made active efforts to reunify respondent-father with his children and prevent the breakup of the family and that the termination of his parental rights was a product of his failure to participate in and benefit from the services, rather than the adequacy of DHHS's efforts. Although DHHS has the responsibility to offer the statutorily required services, "there exists a commensurate responsibility on the part of respondents to participate in the services that are offered." *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012). Indeed, "[n]ot only must respondent cooperate and participate in the services, [respondent] must benefit from them." *In re TK*, 306 Mich App 698, 711; 859 NW2d 208 (2014).

## B. EMOTIONAL OR PHYSICAL DAMAGE

Respondent-father also argues that the trial court clearly erred when it found beyond a reasonable doubt that the children would likely suffer serious emotional or physical damage if returned to his care. We disagree.

In addition to the finding of "active efforts," a trial court may not terminate a parent's rights over an Indian child unless the court finds evidence beyond a reasonable doubt, including testimony of at least one qualified expert witness, that continued custody of the child is likely to result in serious physical or emotional damage to the Indian child. 25 USC 1912(f); MCL 712B.15(4); MCR 3.977(G)(2). *In re Beers/Lebeau-Beers Minors*, 325 Mich App at 665. Contrary to respondent-father's contention, the trial court applied the appropriate standards and did not clearly err when it concluded there was evidence beyond a reasonable doubt that respondent-father's continued custody would likely result in serious physical or emotional damage to the children.

The trial court properly considered the fact that respondent-father had failed to comply with and benefit from the treatment plan. The court noted that the conditions that brought the children into care, particularly respondent-father's mental health concerns, continued to exist. Although respondent-father was in and out of jail during the overwhelming majority of this case, when he was free, he did not participate in the services designed to remove the barriers to reunification. "A parent's failure to participate in and benefit from a service plan is evidence that the parent will not be able to provide a child proper care and custody." *In re White*, 303 Mich App 701, 710; 846 NW2d 61 (2014). "Similarly, a parent's failure to comply with the terms and conditions of his or her service plan is evidence that the child will be harmed if returned to the parent's home." *Id*. at 711. In addition, at the termination hearing, respondent-father admitted that he continued to experience severe anger management issues. Moreover, respondent-father's own testimony established beyond a reasonable doubt that his mental health issues would likely result in serious emotional or physical damage to the children. When asked if he believed that his anger issues affected his ability to safely parent his two children, respondent-father candidly replied, "[T]o be honest, yeah."

The trial court also considered the opinion of the qualified tribal expert witness that termination of parental rights was in the children's best interests and that respondents' continued custody would likely result in serious emotional or physical damage to the children. Gil opined that despite the efforts of multiple agencies, the barriers to reunification had not been reduced. Gil testified that respondents had made poor to minimal progress. She further opined that the children

would be at imminent risk of harm if they were returned to respondents' home because of respondents' general instability, mental health issues, poor parenting skills, and the inability to meet the children's basic needs. Gil also noted that the Sault Tribe Child Welfare Committee, the body that speaks on behalf of the Sault Tribe, supported the termination of respondents' parental rights.

The record also demonstrated that respondent-father lacked suitable housing and had no bond with his children. Respondent-father's conduct throughout the proceedings demonstrated that he lacked the proper parenting skills to safely parent his children. Respondent-father testified that he was aware that if he left Chippewa County and relocated downstate that it would affect his bond with his children. Nonetheless, even with no promise of employment and housing when he arrived, respondent-father chose to leave the county where his children resided and resources were available, to relocate not just once, but on multiple occasions, while this case was ongoing. There was also evidence that respondent-father's poor parenting had already harmed the children and that there was an unacceptable risk that continued poor decision making would cause serious emotional damage to the children in the future.

When viewing the record in its entirety, the evidence was sufficient to support the trial court's finding that the children would likely incur serious emotional or physical harm if they remained in respondent-father's custody. Accordingly, the trial court did not clearly err.

### III. DOCKET NO. 371733: RESPONDENT-MOTHER

Similar to respondent-father, respondent-mother also contends that the trial erred when it terminated her parental rights because DHHS failed to make "active efforts" to prevent the breakup of her family. We disagree.

Much of the evidence discussed above relative to respondent-father is equally applicable to respondent-mother. Similar to respondent-father, respondent-mother was offered a multitude of preventative services for 11 months before the children were removed from her care. After the filing of the petition, respondent-mother was present at the first family team meeting in March 2023 after the children were removed. At that time, several service providers were present to discuss and explain the goals of the service plan. Respondent-mother was offered a treatment plan designed to address her substance abuse issue, mental health concerns, and poor parenting skills. Respondent-mother also received the benefit of courtesy workers when she elected to leave Chippewa County with respondent-father.

Throughout the case, DHHS marshaled a multitude of resources to assist respondent-mother in her search for suitable housing. Foster-care worker Christy Roberts provided housing applications and the necessary documents that would accompany the applications, and requested assigning a Family Continuity worker to assist respondent-mother in reaching her goals. Family Continuity worker Rachel Chamberlin provided a wide variety of hands-on services to respondent-mother, including establishing community network support and prioritizing her appointments. Chamberlin coordinated temporary housing resources while respondent-mother searched for more permanent housing and, with Chamberlin's help, respondent-mother did secure housing by the time of the termination hearing. Chamberlin also provided instruction regarding how to create a

budget and stay within the parameters of that budget, and regularly drove respondent-mother to parenting classes and other stores and offices.

From the start, respondent-mother also had hands-on parenting instruction. Therapist Stephanie Hicks began working with respondent-mother before the court removed the children from respondents' care. Hicks testified that she worked with respondent-mother on her parenting skills and tailored her services to respondent-mother's unique needs. Hicks coached respondent-mother through parenting time, instructing her on how to engage the children. Hicks explained that although respondent-mother was responsive to the instruction, she still required a lot of support during parenting time.

Respondent-mother argues that the court erred when it found clear and convincing evidence that DHHS expended active efforts because respondent-mother was not referred for a psychological evaluation. Respondent-mother's assertion in this regard, however, is not supported by the record. Despite respondent-mother's assertions to the contrary, DHHS referred respondent-mother for a psychological evaluation on more than one occasion. The record shows that a psychiatric evaluation was scheduled for May 2023, but she missed this appointment because she was incarcerated. During the review period between June and September 2023, respondent-mother was again referred for a psychological evaluation but she did not attend this appointment. While in Saginaw, respondent-mother was engaged in therapy through Tuscola Behavioral Health System; however, respondent-mother left the Saginaw area in November 2023 and moved to Fowler, Michigan, before the psychological assessment could be completed. Thus, contrary to her position, early in the proceedings, DHHS did refer respondent-mother for a psychiatric evaluation and a psychological assessment.

Accordingly, the trial court did not clearly err when it concluded that active efforts were made. The record demonstrates that DHHS provided services and programs designed to prevent the breakup of the family, and actively assisted respondent-mother to benefit from those programs.

Affirmed.

/s/ Colleen A. O'Brien
/s/ Kirsten Frank Kelly
/s/ Stephen L. Borrello