*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* E. E. GEROU, Minor.

UNPUBLISHED
September 19, 2025
9:27 AM

No.   375280
Kalamazoo Circuit Court
Family Division
LC No.   2023-000098-NA

Before:  SWARTZLE, P.J., and GARRETT and YATES, JJ.

PER CURIAM.

The trial court terminated respondent-mother's parental rights to EG.[1]  Respondent-mother argues that the trial court failed to abide by the special protections of the Indian Child Welfare Act (ICWA), 25 USC 1901 *et seq*., and the Michigan Indian Family Preservation Act (MIFPA), MCL 712B.1 *et seq*.  We affirm.

## I.  BACKGROUND

EG was born in February 2023, and, soon after, petitioner sought the removal of EG from respondents' care.  Respondent-mother was also the mother of JM, MW, and TM.  At the time of EG's birth, respondent-mother was already involved in child-protective proceedings related to JM and MW following the death of TM in September 2019.  TM had been taken to the hospital with "blunt force trauma."   Respondent-mother reported that TM had fallen from a highchair, which medical providers reported was not a possible cause of TM's injuries.  MW also had multiple injuries, and respondent-mother admitted to striking MW with a belt.  Further, JM was dirty, had insect marks on his body, and had broken bones in various stages of healing.  *In re Mueller/Wells,* unpublished per curiam opinion of the Court of Appeals, issued May 16, 2024 (Docket No. 367427), slip op at 1.  Ultimately, respondent-mother's then-partner pleaded no contest to a charge of manslaughter, related to TM's death, and, after months of services, the trial court

---

[1] The trial court also terminated respondent-father's parental rights, but he is not a party to this appeal.

terminated respondent-mother's parental rights to JM and MW. *Id*. This Court affirmed that termination. *Id*.

In addition to highlighting respondent-mother's history with her other children, the petition in this case alleged that respondent-mother had unstable housing and emotional instability, and respondent-father had a history of aggressive behavior. Respondents had also threatened to cut off EG's security tag and leave the hospital with her. The trial court took jurisdiction in June 2023.

EG was placed in foster care with JM in Kalamazoo. EG was also enrolled as a member of the Sault Ste. Marie Tribe of Chippewa Indians ("the Tribe") through respondent-father, who was also a member of the Tribe. In July 2023, the trial court ordered that the case be transferred to the Tribal Court, but the Tribal Court rejected the transfer.

During a November 2023 hearing, an agency caseworker explained that the agency was in communication with the Tribe and requested that respondent-mother's parenting time remain supervised. Respondent-mother informed the trial court at the hearing that she was pregnant. The trial court found that respondent-mother had made progress toward reunification and that active efforts had been made, but ordered that her parenting time remain supervised.

Foster-care caseworker Alexia Balay testified during a March 2024 review hearing that respondent-mother was engaged in counseling. Respondent-mother was on medical leave from work, did not have an income, and had been denied for food stamps. Respondent-mother was living with a friend in the Grand Rapids, Michigan area, but the friend would not allow the agency to assess the home. Balay had provided information on housing resources. Parenting time was going well, and the agency provided gas cards to respondent-mother.

Amanda Gil, a caseworker with the Tribe, testified that the tribal services available to EG were limited because of her location. The Tribe's service area primarily included the eastern Upper Peninsula, although EG would also be eligible for national tribal services.

During a permanency planning hearing in May 2024, respondent-mother's counsel informed the trial court that respondent-mother had moved to southern Indiana. Counsel for petitioner stated that it intended to seek a change in the permanency goal to termination. Petitioner had contacted the tribal caseworker and counsel, and they needed to take the issue to the Tribe to determine whether the Tribe supported the recommendation. Accordingly, petitioner asked the trial court to adjourn the hearing. The trial court adjourned the hearing.

During the reconvened hearing, Paige Harrison, a foster-care caseworker, testified that the Tribe supported the terminations of respondents' parental rights to EG. Respondent-mother had given birth to a baby, and the baby was in foster care in Indiana. An Indiana caseworker was concerned that respondents were still together, despite denying a continued relationship. Respondent-father continued to make threats against various individuals, including a caseworker and his counselor, and they had obtained personal-protection orders. Further, EG was removed from daycare until law enforcement located respondent-father, who was subsequently incarcerated related to the threats he made.

Harrison had needed to "put in an exception request for supportive parenting" services to occur, because the case had been open for more than six months, and the request had been granted.

Further, virtual visits had been arranged when respondent-mother could not travel from Indiana to visit EG. The agency also provided respondent-mother with gas cards. Harrison testified that she had made an appointment with EG to see a tribal doctor. A caseworker in Indiana had visited respondent-mother's home and found that it was not appropriate for respondent-mother's newborn child. Harrison had provided housing resources to respondent-mother, although it was difficult because Harrison was not familiar with community resources in Indiana. Petitioner filed a supplemental petition seeking termination of respondents' parental rights in September 2024.

During an October 2024 review hearing, caseworker Brandy Herman testified that the agency could accommodate longer visits. Herman and respondent-mother had not discussed increasing the duration of the visits "[b]ecause the visits ha[d] not been in-person consistently enough." Half of respondent-mother's recent visits had been virtual. Herman testified that "more time was available and offered when [respondent-mother] was living in Michigan," but her move to Indiana made visits more challenging, and her drive to visits took five hours.

Trial on the termination of parental rights began in January 2025. Respondent-father testified that he and respondent-mother were not in a relationship, but she had last visited him two days earlier because she was "a support person for" him.

Harrison testified that the efforts that petitioner undertook to work toward reunification included coordinating with the Tribe and communicating with Gil, who gave Harrison information about active efforts to take. Further, Harrison had provided respondent-mother with information about services in Indiana, including resources for counseling, housing, and employment. The agency had provided respondent-mother with case-management services, family-team meetings, and gas cards, and respondent-mother had engaged in parenting classes. Harrison created parent-agency treatment plans and reviewed them with respondents. Harrison had also spoken with respondent-mother's Indiana caseworker.

Respondent-mother had also completed a psychological evaluation and engaged in counseling. Respondent-mother's psychological evaluation indicated a concern that respondent-mother had failed to accept what happened with the previous terminations. Harrison did not see that respondent-mother had benefited from services enough for EG to be with her unsupervised. Harrison opined that EG would be harmed if she were returned to respondents.

A review hearing was completed after the first date of the termination trial. During the hearing, Herman testified that respondent-mother was living with various family members in Indiana. Respondent-mother's therapist told Herman that he was concerned that respondent-mother was struggling to balance working and attending parenting-time visits. Respondent-mother's counseling time was increasing, which Herman thought would be beneficial. Herman testified that respondent-mother's visits went well when she had a parent advocate present, but sometimes respondent-mother would not bring food or diapers for EG. Herman would attend an upcoming Indiana family-team meeting.

The termination trial reconvened in March 2025. A family case manager with the Indiana Department of Child Services testified about threats that respondent-father had made toward her and others, resulting in protection orders being issued. A commander of an Indiana jail, in which respondent-father was incarcerated, testified that respondent-mother had engaged in

approximately 54 video visits and 163 phone calls with respondent-father since he entered the jail in June 2024, and she had put money into respondent-father's commissary account. Further, respondent-father had made statements that led the commander to believe that respondent-father wanted to reunite with respondent-mother upon his release from jail.

Herman testified that respondent-mother had recently shown Herman text messages from respondent-father that indicated that respondent-father wanted EG placed with his brother so that respondent-father's brother could give EG to respondent-father, and respondent-father would allow respondent-mother to see EG. Herman was concerned about respondent-mother's ability to deal with the stress of working and parenting EG, considering respondent-mother was already stressed balancing work and supervised visits. According to the psychological evaluation, respondent-mother "had a significant amount of treatment and intervention and continue[d] to demonstrate limited insight into her problems and difficulties." Herman also observed that respondent-mother was easily sidetracked and struggled to supervise EG properly during visits. Respondent-mother's visits with EG lasted two hours.

Further, Herman testified that respondent-mother struggled with finances and did not have housing. Herman believed that the agency had adapted services to meet respondent-mother's needs to the best of its ability, considering that respondent-mother had moved out of Michigan. Specifically, the agency accommodated respondent-mother by having virtual parenting-time visits when respondent-mother could not come to Michigan, and by providing gas cards to pay for travel expenses. An Indiana caseworker was assisting respondent-mother with services, and respondent-mother was seeing a home-based counselor and a peer-recovery coach. Herman spoke "regularly" with respondent-mother about services. Herman was concerned about respondent-mother's emotional instability, difficulty identifying safe romantic partners, and the possibility of respondent-mother using physical discipline because she had done so with her other children. Respondent-mother had never acknowledged to Herman that respondent-mother had been abusive or neglectful to her other children.

Gil testified, explaining that she was an "Indian Child Welfare Act case monitor, as well as the designated qualified expert witness for the Sault Tribe." Gil had been involved with EG's case since EG's removal two years earlier. Gil was an enrolled member of the Tribe and had testified as a qualified expert witness approximately 200 times. The trial court deemed Gil as an expert in the customs of the Tribe as they pertained to this case. Gil explained that the agency had kept the Tribe informed and communicated with Gil more than the average case. Gil believed that the agency had made active efforts to provide services and reunify EG with both parents. The case-service plan had been comprehensive and included collaboration with the Tribe and with caseworkers in Indiana. Gil testified that the efforts were culturally appropriate and specific.

Petitioner's attorney asked Gil if she thought that continued custody of EG by respondents would likely result in serious physical or emotional damage to EG, and Gil stated, "Yes, I do, both physical and emotional." Gil explained that respondents' situations were unstable, and respondents failed to benefit from the services. Gil had concerns with respondent-mother's "ability to do the day-to-day parenting of an infant child," and neither parent had acknowledged their roles in the need for the proceedings. Petitioner's attorney asked if, as a qualified expert witness, Gil thought that termination was necessary to prevent imminent physical harm to EG. Before Gil could respond, respondent-mother's counsel objected on the basis that the Tribe was

"an observer." The trial court stated that it was only considering as expert testimony Gil's testimony about whether services were culturally appropriate because Gil's expertise was on "the traditions and customs of the Sault Tribe." Gil went on to testify that termination was necessary for EG so that she could obtain permanency and a safe environment. On the basis of the lack of progress over the case, Gil opined that EG "would continue to be exposed to a risk of both physical and emotional harm" if returned to either respondent. Gil testified that the agency had diligently searched for a relative placement and that EG's placement with her brother was appropriate, in accordance with the wishes of the Tribe and in compliance with ICWA and MIFPA.

The trial court determined that there was clear and convincing evidence that termination was warranted under MCL 712A.19b(3)(c)(*i*), (c)(*ii*), (i), and (j). Further, the trial court concluded that termination of respondents' rights was in EG's best interests. The trial court also found that the agency had provided active efforts to reunify EG with respondents and that Gil had testified that the agency's services were culturally appropriate.

Finally, the trial court found beyond a reasonable doubt that EG would likely suffer serious emotional or physical harm if returned to respondent-mother. The trial court concluded "based on all of the evidence, including the evidence of the testimony of Ms. Gil, that it is beyond a reasonable doubt in this Court's mind that [EG] could seriously be harmed, possibly killed, emotionally damaged as well with these parents." Accordingly, the trial court terminated respondents' parental rights.

Respondent-mother now appeals.

## II. ANALYSIS

Respondent-mother argues that the trial court erred by finding that the agency provided active efforts toward reunification and by finding that, beyond a reasonable doubt, EG would likely suffer serious emotional or physical harm if returned to respondent-mother's care.[2] Because EG is a member of the Tribe, ICWA, MIFPA, and MCR 3.977(G) apply to the termination of respondent-mother's parental rights. See *In re Beers*, 325 Mich App 653, 660-661, 663-665; 926 NW2d 832 (2018).

We review for clear error a trial court's factual findings. *Id*. at 680. Clear error exists if this Court is left with a definite and firm conviction that the trial court made a mistake. *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010). "We review de novo the interpretation and application of statutes and court rules." *Id*.

## A. ACTIVE EFFORTS

First, respondent-mother argues that the trial court erred by finding that the agency made active efforts toward reunification. "A party seeking termination of parental rights to an Indian child under state law must demonstrate to the court's satisfaction that active efforts have been

---

[2] Respondent-mother does not challenge the trial court's statutory-ground or best-interest determinations.

made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that the active efforts were unsuccessful." MCL 712B.15(3). "'Active efforts' require affirmative, as opposed to passive, efforts" and "more than the standard 'reasonable efforts' approach." *In re Beers*, 325 Mich App at 680 (cleaned up). "Active efforts require more than a referral to a service without actively engaging the Indian child and family." MCL 712B.3(a). The trial court must find clear and convincing evidence that active efforts were made. *In re England*, 314 Mich App 245, 259-260; 887 NW2d 10 (2016).

The record demonstrates that respondent-mother began several services in Michigan. When respondent-mother moved to Indiana, caseworkers provided her with information on services in Indiana. The agency provided respondent-mother with gas cards to assist with the expense of respondent-mother traveling to Michigan to visit EG. When respondent-mother could not travel to Michigan, she visited with EG remotely. The agency also communicated with respondent-mother's caseworkers in Indiana. Further, Gil testified that the agency's services were culturally appropriate, including that the agency had diligently searched for a family placement for EG, and EG's placement with a sibling was compliant with the Tribe's preferences.

Respondent-mother argues that the services were "generic" and not modified when it became apparent that she was not showing benefit. Respondent-mother does not, however, state what actions could have been taken to help respondent-mother benefit from services. Respondent-mother's move to Indiana limited the agency's ability to monitor and provide services, but the record demonstrates that the agency continued to monitor respondent-mother's engagement with services and attempted to coordinate with Indiana caseworkers. Although respondent-mother's parenting time was limited, the record shows that respondent-mother's long drives from Indiana and other responsibilities made longer or more frequent visits impracticable. The agency was open to longer visits, but continued to supervise visits out of concerns for EG's safety, and respondent-mother used a parenting advocate during visits. Despite these services, respondent-mother did not demonstrate much benefit. "Not only must respondent cooperate and participate in the services, she must benefit from them." *In re TK*, 306 Mich App 698, 711; 859 NW2d 208 (2014). Under these circumstances, the trial court did not clearly err by finding that the agency made active efforts at reunifying respondent-mother and EG.

B. SERIOUS EMOTIONAL OR PHYSICAL DAMAGE

Next, respondent-mother argues that the trial court erred by finding beyond a reasonable doubt that EG would likely suffer serious emotional or physical damage if returned to respondent-mother's care. A trial court may not terminate the parental rights of a parent of an Indian child unless the trial court "finds evidence beyond a reasonable doubt, including testimony of at least one qualified expert witness as described in MCL 712B.17, that parental rights should be terminated because continued custody of the child by the parent or Indian custodian will likely result in serious emotional or physical damage to the child." MCR 3.977(G)(2). See also 25 USC 1912(f); MCL 712B.15(4). "[A] trial court's 'beyond a reasonable doubt' finding must 'contain' or 'encompass' testimony of a qualified expert witness who opines that continued custody of the

Indian child by the parent will likely result in serious physical or emotional harm to the child." *In re Payne/Pumphrey/Fortson*, 311 Mich App 49, 60; 874 NW2d 205 (2015).[3]

When making its termination decision, the trial court relied, in part, on Gil's testimony. Further, the trial court identified that respondent-mother was in a worse position than she was at the beginning of the proceedings. Respondent-mother lacked stable housing and did not benefit from services to address her emotional instability or the termination of her rights to JM and MW. "Evidence of how a parent treats one child is evidence of how he or she may treat the other children." See *In re Hudson*, 294 Mich App 261, 266; 817 NW2d 115 (2011).

Although respondent-mother points to comments that the trial court made earlier in the case about EG being safe with respondent-mother, petitioner continued to request that respondent-mother's visits be supervised out of concern for EG. Further, the record evidence shows that respondent-mother was overwhelmed with her life circumstances, even without EG in her care. Additionally, respondent-mother's relationship with respondent-father was a significant cause for concern. Respondents denied still being in a relationship, but there was ample evidence contradicting this. Given the record evidence, the trial court did not err by finding beyond a reasonable doubt that EG would likely be seriously harmed if left in respondent-mother's custody.

Affirmed.

/s/ Brock A. Swartzle
/s/ Kristina Robinson Garrett
/s/ Christopher P. Yates

---

[3] When Gil was asked to opine that termination was necessary to prevent harm to EG, respondent-mother's counsel objected to the testimony on the basis that the Tribe was an observer, and the trial court stated that Gil could testify about termination, but she was only deemed an expert in Tribal customs.

Respondent-mother does not rely on the lack of expert testimony as a basis for reversible error. The trial court clearly relied on Gil's testimony when making its finding that EG would be at risk of serious harm in respondent-mother's care. Moreover, the Tribe supported the termination of respondent-mother's rights, and Gil was an appropriate qualified expert witness under MCL 712B.17. Thus, given that respondent-mother has not challenged this aspect on appeal, we merely observe that the substance of Gil's testimony supported termination, as the trial court understood, and her entire testimony (not just the cultural aspect) could have been deemed as expert testimony.